THE STEAMER NEW PHILADELPHIA—*Camden & Amboy Co., Claimants; Brady, Libellant.*

A steamer having a coal-barge in tow was navigated so carelessly or unskilfully that the barge was in danger of striking a sloop lying fast at a dock. The sloop, to prevent the collision, put out a fender, by which the barge was so injured that she filled and sunk : *Held*—

1. That the owner of the barge was entitled to recover from the steamer for the loss of his vessel and cargo.

2. The putting out of the fender for such a purpose was no fault on the part of the sloop.

3. If there had been a fault, from the kind of fender used, the steamer would nevertheless be responsible.

4. The rule is, that when property is injured by two co-operating causes, though the persons producing them may not be in intentional concert, the owner is entitled to compensation from either or both, according to the circumstances.

5. Especially is the injured party entitled to recover from that one of the two who has undertaken to convey the property with care and skill to a place of destination, but has failed to do so.

Patrick F. Brady filed his libel against the steamer New Philadelphia, her tackle, apparel, and furniture, in the District Court of the United States for the southern district of New York, in a case of collision, civil and maritime, alleging that he, the libellant, was owner of the coal barge Owen Gorman,

---

which was taken by the New Philadelphia to be towed to and left at a certain place in New York harbor; but, owing to the unskilfulness with which the steamer was navigated, a collision occurred between the coal barge and a schooner lying at one of the docks, by which the barge was sunk.

Process was duly issued, and the New Philadelphia attached. The Camden and Amboy Railroad and Transportation Company intervened, and made claim to the vessel, as owners thereof. The proper stipulation being filed on the same day, the vessel was discharged, and the claimants put in an answer denying the material facts set forth in the libel.

The District Court, after hearing a great number of witnesses, dismissed the libel for the following reasons, given by BETTS, J.:

"The steam-tug New Philadelphia, employed in towing barges and vessels of various classes between New Brunswick and New York, through the Raritan river and across New York bay, had in towage the barge Owen Gorman, loaded with coal, to be taken from New Brunswick and landed at the foot of 26th street, on the East river. She had nine other vessels in the same tow, which were destined to different landing points on the North and East rivers, and also at docks and piers on the Brooklyn side. The Owen Gorman was to be left by the tug at Washington street, Brooklyn (Williamsburg.) In making the course round from the North river, the tug stopped and landed a barge at the Atlantic docks, Brooklyn shore, and in so doing the Owen Gorman was brought against a *small sloop*, moored at that dock. So soon as that barge was discharged the tow proceeded to Washington street, where within an hour the Owen Gorman was brought up to a pier by the tug, and was there cast off and left, the tug proceeding immediately after to her place of destination. After she was discharged and the tug was clear of her, and on her way to 26th street, the barge was found leaking rapidly, and during the effort made by those in charge of her to haul her into the slip and prevent her from sinking, she filled by water running through holes or breaks in her starboard side, and went down in deep water, and was afterwards raised, with con-

·siderable cost and loss to the libellant both in respect to vessel and cargo.

"This action charges the damages the owner incurred to the fault of the tug in causing the Owen Gorman to be brought into collision with the sloop at the Atlantic docks, at the time of landing a barge at that place in her transit round to Washington street. The injury was not discovered until she had been left at the latter place, and the men were endeavoring to haul her in.

"The testimony fastens no blame upon the tug in the manner the landing of the barge was effected at Washington street. The allegations of tort in the tug by the libel, and the evidence in the support of the charge, all rest upon the assumption that the wrongful act and collision committed by the tug consisted in bringing the Owen Gorman against the side of the sloop at the Atlantic dock; and if that charge is not supported, the libellant has no ground of action before the court.

"It is unnecessary to go into a detail of the particulars of that transaction or the representations of the various witnesses in respect to it, as, in my opinion, the evidence does not justify imputing to that cause the injury which the barge received, and which led to her sinking. Over twenty witnesses were examined and re-examined with great fullness as to the facts and circumstances attendant upon the transaction; and, in my judgment, the clear weight of proof is, that the damage to the barge which caused her sinking and all subsequent expenses was received after she left charge of the tug at Washington street, and that it does not come within the scope of the present complaint. A minute collation and review of this mass of evidence would be a profitless labor, as no legal principle or doubt is involved in its admissibility or import. It is solely a question as to which class of witnesses had the best means of knowing the facts, and under all the circumstances is most to be relied upon in their statements.

"My opinion is, that the claimants have succeeded in showing that the tug was not the culpable agent of the damages sustained by the libellant, and the libel must accordingly be dismissed with costs."

From this decision of the District Court an appeal was taken to the Circuit Court, where it was reversed, and a decree made that the libellant recover. It was referred to a commissioner, who reported the amount of the damages suffered by the libellant to be $3,159 34. To this report various exceptions were taken, some of which were sustained, and others overruled, so that the damages were reduced to $2,898 84, for which latter sum it was decreed the libellant should have execution. The claimants then took their appeal to this court.

*Mr. Murray*, for libellant, contended that the proper view of the facts had not been taken by the Circuit Court, and argued as matter of law that the decree of the District Court ought not to have been disturbed, because the decision of a court on a question of fact, like the verdict of a jury, should be affirmed, unless it be clearly against the evidence. *The Grafton*, (1 Blatchford C. C. R., 173; 3 Graham & Waterman on New Trials, 1213 and 1240.) The evidence introduced by the libellants, after the appeal to the Circuit Court, was merely cumulative, and did not authorize a conclusion contrary to that of the District Court.

The tug-boat in this case was not a common carrier, and was not liable for anything short of gross negligence. *Wells* vs. *Steam Nav. Com.*, (2 Com., 204;) *Caton* vs. *Rumney*, (13 Wend., 387;) *Alexander* vs. *Greene*, (3 Hill, 9;) Story on Bailments, § 496; Edwards on Bailments, 428, 573, 574.

*Mr. Burrell*, for libellant, conceded the rule to be that the decision of the court below, upon a question of fact, should be deemed conclusive, and that this court should not be required to review such decisions, and relied upon the authorities cited by the libellant's counsel. But this principle should prevent and restrain this court from interfering with the decree made in the Circuit Court, and will certainly furnish no justification for its reversal in order to make room for the reinstatement of the decree which the libellant obtained on only a part of the testimony in the District Court.

The owners of the steamboat having undertaken to tow the

barge, and no special contract being proved, were bound to exercise all the care, skill, and diligence necessary for the discharge of their obligations. *New World* vs. *King*, (16 How., 474–5.)

In this case the damages to the tow were occasioned by negligence and want of ordinary skill, care, and prudence on the part of those who were intrusted with the navigation of the tug.

Mr. Justice WAYNE. This is an appeal in admiralty from the Circuit Court of the United States for the southern district of New York.

It has been argued with minuteness and ability by the proctors of the parties, as well in respect to the allegations of the libel and answer, as to the incidents of its trials in the Circuit and District Courts. The case has had our best consideration.

The libel sets forth that Patrick Brady was the owner of the barge Owen Gorman, and that, on the 12th April, 1856, she left Richmond, in Pennsylvania, for Brooklyn, New York, under the command of Patrick Campbell, with a cargo of 207 10–25 tons of coal; that, on the 17th April, the barge and eleven other barges were towed from the Delaware and Raritan canal, at New Brunswick, by the steamer New Philadelphia, into the waters of the Hudson or North river. There she landed one of the barges, at the foot of Washington street, New York, and another of them at the foot of Hammersly street, and then entered the East river, with several of her fleet, steering and heading for the Atlantic dock, in Brooklyn, where she was to land another of the barges. That in doing so, the steamer ran across the tide, then running a strong ebb, and steered close to the dock, in such a manner that the Owen Gorman was swung and driven with great violence against the schooner (or sloop) Financier. That persons on board of the latter, seeing the steamer swinging in, and that she would be struck by one of her barges, threw out a wooden fender, to ward off the impending collision, which, having been forced from their hands, was forced and crushed into the Owen Gorman on her starboard side, just forward of midships, cut-

ting in her planks, and making a hole, through which she was filled with water, and sunk, with her cargo.

It is alleged that the collision was caused by the negligence and want of care or skill of the master and crew of the steamer, and not from any fault of those persons who were on board of the Gorman. It is also alleged that, immediately after the sinking of the Gorman, the owners of the steamer were informed of it, and that a protest, in due form, had been served upon them.

The libellant then states the loss from the collision; that he had, at the request of the agent of the owners of the steamer, employed William J. Babcock, a wrecker, to raise her, the latter having done, upon different occasions, work of that kind for the company. That Babcock contracted to raise and put her afloat for $450—it being then expressly understood, between the agent and the libellant, that, if the hole which had caused the sinking of the barge should be found where the latter expected and said it was, the company were to be responsible for all damages done to the barge, and for the losses sustained from her having been sunk by the collision.

Babcock raised the barge sufficiently to have her taken to Red Hook Point, and there beached her upon the flats, so that the tide rose and fell in her, when it was ascertained that the hole was in the starboard side of the barge, a little forward of midships. Babcock then proceeded, without the knowledge of the libellant, to discharge the coal from the barge, had the same stored in the coal yard of the consignees of it, and then gave notice to the libellant that he had advertised the barge and the coal for sale, to pay his wrecker's lien upon them, which he claimed to have, in virtue of the wrecker's act of the State of New York.

The barge and coal were sold, the first being bought by Henry J. Vroom, for three hundred and fifty dollars; the coal was purchased by the consignees of it, at three dollars per ton. The sale was without the consent of the libellant, and when he was absent from New York. When he heard of the sale he came to New York, to protect his interest, and intending to pay Babcock for raising the barge, as the owners of the

steamer had refused to do so. It was finally arranged, by his paying to Babcock $450, the sum which had been agreed upon; the further sum of $299 96 for unloading, carting, storing, and shovelling the coal; and the further sum of $236 12 to the consignees for the deterioration of it, which had been estimated by two referees, each party having chosen one of them.

The libellant then sets out, that the barge was so injured from the force and violence of the collision, and the pressure of the steamboat and inner barge, to which she was lashed when it occurred, that it became necessary to take her to the dry dock for repairs. That it was at a time when the barge's services were particularly valuable to him, and that, from her having been sunk, he had sustained damages for her repairs, for the loss of all her fixtures, and for the loss of time, and for the expenses of her master and crew, exceeding two thousand dollars, which the consignees of the New Philadelphia had refused to pay.

The allegations in the libel are direct, positive, leaving nothing to implication, and not exaggerated, either by inapt circumstances or coloring.

We will now place in juxtaposition with it the answer. Those pleadings will disclose the issues between the parties, and enable us to apply the evidence to them successively, or in the order of their affirmation.

The claimants admit that they are and were the owners of the New Philadelphia, when the barge Owen Gorman and ten other boats were taken by her to be towed from Brunswick, New Jersey, to be left at New York and Brooklyn, at different designated points in both; that they were ignorant then, as they are still, who were the owners of the Gorman, or of the number of tons of coal then on board of her. They deny that she was then a tight, strong, and staunch vessel, and charge that she was unfit for the transportation of her load for the passage she was to make. It is then averred, upon information and belief, that the landing of the steamer at the Atlantic dock, in Brooklyn, where the injury to the barge, as is described to have happened, was in this manner:

That the steamer, after having left six barges at their places

on the North river, proceeded from it into the East river with the other barges in tow, to leave them at their places of destination; that the Gorman was in the first tier of boats on the outside, on the starboard side of the steamer as she approached the Atlantic dock "*from westwardly*," and headed up the East river, when the tide *was about the first of the ebb;* that one of the barges on the steamer's larboard was destined for that dock, and in the act of leaving her there; that the steamer came to with her fleet with her starboard side nearest the dock, and alongside of a sloop lying at the dock, which was a fit and suitable place to leave her, and that the steamer and her fleet were brought to alongside of the sloop with great care and gentleness. It is admitted that a fender had been put out by some person on board of the sloop to fend off the barge; but whether the fender had been forced and crushed into her they were ignorant, and deny. It is admitted that the barge sunk at the Washington pier, to which she had been towed by the steamer, within an hour after the collision had occurred at the Atlantic dock.

It is then alleged that the master and crew of the barge had allowed her to sink with her cargo, without making an effort to prevent it, and that notice had not been given to the master of the steamer of the barge's sinking condition, to enable him to make any attempt to do so. The claimants then deny that Babcock had been engaged by their agent to raise the barge, and that he had only recommended Babcock as a fit person to be employed for that purpose; and that if their agent had done otherwise, that it was not within the scope of those duties they had engaged him to do; that he could make no contract to bind them for any damage which the barge had sustained from the collision, or for any expense whatever growing out of her having been sunk from the causes set forth in the libel.

The damages and expenses are charged to have been largely increased by the negligence and inattention of the master of the barge. It is also charged, that she had been towed, under an agreement made with her master; that it was to be done at his and her owners' risk.

*The Steamer New Philadelphia.*

The issues, then, to which the evidence is to be applied, are substantially the state of the tide when the steamer, in entering the East river, was steered across it to land a barge at the Atlantic dock; next, that the Gorman was not seaworthy for the carriage of her cargo, and that she was not a tight, staunch, and strong vessel. We dismiss these averments in the answer, by observing that the owner of the barge proved very satisfactorily that she had been well built with the best materials; had been thoroughly repaired the year before the collision, in respect to all the wear and tear of her five or six years' service after she was built; and that she was staunch and strong, and particularly water-tight, when she was approaching the Atlantic dock in tow of the steamer. Two witnesses say that they saw her pumps tried one hour before, and that she was dry. Their testimony is conclusive to establish the seaworthiness of the barge in every particular, from the time that she was lashed to the steamer at New Brunswick to be towed to Brooklyn, until after she had been collided with the sloop at the Atlantic dock.

The third issue is, whether or not she had been brought alongside of that vessel with care and gentleness, or with the force and violence of a collision, to cause the injury by which she had been sunk.

The fourth issue arises from the charge in the answer, that there had been a want of care in her master, in permitting her to sink with her cargo, after she had been landed at the Washington pier, without any effort to prevent it, and from not having informed the master of the steamer of the injury she had sustained, or that she was sinking, until an hour or more after she had sunk. Here, let it be remarked that we have the respondents' own appreciation of the time of the delay of which they complain in not having had notice of the injury to the Gorman, and that it was an hour or more after the occurrence. It supersedes the necessity of any further consideration of that charge, particularly as, when the steamer left the barge at the Washington pier, she immediately steamed off to drop another of her fleet at a distant point, without the slightest concern or inquiry of the consequences which the collision had produced.

Such are the issues to be considered, and the only correct way of doing it is by a minute citation of the testimony. Kelly, the witness, says he was on board the Gorman at the time of the collision. The barge was on the starboard side of the steamer next to Brooklyn, and she was the outside barge, one other barge being between her and the steamer. The steamer had come from the North river around Governor's island, around Buttermilk channel, and across it to Atlantic dock. The steamer was intending to go up East river, and was attempting to drop a barge at Atlantic dock. That barge was on larboard side of tow, but cannot specify her position. The steamer came in *across, the tide running out a strong ebb*, and, in the effort, the tug swung round and struck the Owen Gorman against the schooner, which was fast at the dock, with weight of the whole tow. Two men on schooner ran and threw a long stick or fender between tug and steamer. The force of the junction pressed the stick out of their hands, and raised it perpendicularly between the two vessels; blow and jar was very severe. Witness saw the stroke; was standing forward of midships' cleet, about three feet from where the fender struck, and as he saw it wrenched out of the men's hands, he started back to get out of the way. The barge was forward of place where the witness stood. The tug landed a barge, and then started up East river with the residue of her tow, including the Owen Gorman, to Washington street, a mile or more above, where she was landed nicely. Then found she was lowered in the water. He then went on her, and into her hold, where he found the water up to his knees. She was hauled into dock, and there she sunk in twenty minutes. Found that she was making water as soon as she was cast off from the tug. Afterwards found planks crushed in at place where the stick or fender struck her, about the width of two planks, and two or three feet long; the planks were broken. Nothing occurred between Atlantic dock and place of landing. Supposes the loading of coal prevented the water pressing in sooner. *Tow was swung round at Atlantic dock by the tide.* After landing boats at North river, asked master of the Gorman how she stood the service, and a few moments before collision. He said she was per-

fectly dry, and drew the pump in witness's presence, and it sucked perfectly dry. Had unloaded her four times before, and never found any water in her. She was a sound and good boat.

In the cross-interrogation of this witness, he qualifies nothing, adds nothing, and his testimony is not contradicted by any other witness in the case, but is confirmed by several. Daly, the second witness, says the *tide was ebb and strong;* blow was strong; did not feel the shock; saw men putting out fenders from the sloop; cannot describe it particularly; all done quickly; saw the collision standing on the deck of his boat. The tow, coming from North river, swung around and knocked against vessel at dock. Cannot say what caused the tug to swing round; *supposed barge was injured when the blow was given.* Daniel McCauly was in the barge, and in the cabin, when the blow was received; felt it; dishes were knocked out of his hand, and gave him a shock in his seat, but not severe enough to knock him off his seat. Patrick Campbell says, tide *was a strong ebb;* corroborates, in its particulars, the occasion of the collision; says it was the unskilful manner in which the steamer attempted to land the stern-boat on her larboard side; both she and her fleet were brought round in an unskilful and careless manner. Either the steamboat should have headed up the East river sooner than she did, and at a greater distance from the dock, and, in passing up, dropped the barge she intended to land, or else she should have headed for the dock until within a certain distance, and then heaved a line, dropped the barge, and passed on. The barge was struck on her starboard side, about midships, with great force, so as to break the planks on that side, making two holes in the third plank above the bilge plank. After the collision, steamer continued on her way with the barge as far as Washington street. The barge met with no other injury between the time of the collision and her sinking. The facts stated by the witness have been given, with his impression of the cause and consequences of them, when they occurred. John Campbell says the tide was ebb and running strong. The steamboat should have made allowance for the tide, which was running hard, which

was not done. Schweimer says the *tide was ebb and running strong.* William Murtagh says, I met the captain of the steamer, and asked him how he came to sink the Owen Gorman. He said he never landed a boat so nicely. I asked him if he did not swing her against a schooner. He said he was landing one of his boats in tow at the Atlantic dock, and it being a strong ebb tide, his tow swung round, and, the Owen Gorman being the last boat to the "spur" boat, swung in against a schooner lying next to the wharf, and that one of the hands on board of the schooner held a wooden fender down, and it was probable schooner and fender striking between two timbers made a hole in her, and caused her to sink. An unsuccessful attempt was made to weaken the force of Murtagh's testimony, but not to discredit him, by calling as a witness Edward Duffey, who was with him at the time the conversation took place between Murtagh and the captain of the steamer. In Duffey's statement of it, he does not introduce the words, "and it being a strong ebb, his tow was swung." His report of it is, the captain said he had come to Brooklyn to land one of his boats, and the swinging around, and the fact that the Owen Gorman was the boat next the spur-boat, on the outside boat of the tow, operated so that when the Owen Gorman struck a schooner lying at the dock, that if she had got a hole in her that caused her to sink, it must have been caused by the collision consequent on the tow swinging against the schooner. Duffey was introduced as a witness to relieve Captain Holman from the imputation of having misstated, in his conversation with Murtagh, the time of tide when the collision took place differently from what he said it was in his evidence. But what the captain stated was this: "Went north of Governor's island and across Buttermilk channel, three or four hundred yards below the end of the island, east face, then hauled up *against the ebb tide*, and landed barge. He considered it a good landing. Thinks it was about *slack tide in North river;* ran up the docks two or three hundred yards, and alongside of the vessel, and stopped tug, and then left the wheel, leaving pilot there, to attend to landing a barge from the larboard side; and after landing her, continued up to Wall street,

Brooklyn.   Returned to the wheel again; did not see the
fender put down; it was an easy landing, with a little drift
play upon the boat.   Stopped engine about two hundred feet
from the vessel at the wharf, and headway of tug stopped
three or four feet from her, when witness left the wheel; there
was no headway at all on tow at the time of collision; head-
way of tow was a little in towards the vessel, and that caused
her to come into collision; it was *that sheer that brought her against
the vessel*.   Thinks she was a sloop, about thirty feet long, and
higher than the barge; never safe to put a wooden fender be-
tween vessels; is always liable to cause damage, because these
tow-boats are weak, and fenders are apt to break them in."
We have been particular in citing Captain Holman's testimony
in his own words.   Taken in all its connexion, it serves to
establish, that the cause of the collision was owing to his not
having made allowance of distance enough between the barge
and the sloop, when he was approaching her, to prevent that
sheer which brought the barge into collision with her.   He
says, "headway of tow was steered a little in towards, and that
caused her to come into collision."   His having said that there
was no headway at all on tow at the time of collision, does
not alter the fact of its occurrence—from his not having prop-
erly estimated his boats' inward movement towards the sloop,
when he was steering "a little towards her," and so near to
her, that the collision was caused by a sheer of the steamer.
Sheer, in nautical meaning, is a deviation from the line of the
course in which a vessel should be steered, and though it may
occur from causes unpreventable by the most skilful seaman-
ship, it more frequently happens from an unsteady helmsman;
and the latter was the fact in this instance, probably produced
by the person then at the helm not being watchful enough of
the state of the tide when advancing to the Atlantic dock to
land a barge.   We need not cite more of the testimony to
establish it to be a fact, that, when the collision happened,
the tide was running strong ebb, and had its agency in pro-
ducing the collision.

   The attempt to account for the sinking of the barge by her
having been injured by iron spikes when she was left at her

place of destination, is most unsatisfactory. Babcock's testimony in that particular, both as to his suggestions and opinions, is altogether conjectural. There is not even a possibility of its being correct, unless the testimony of every other witness in the case shall be considered mistaken and untrue. Babcock did not mean to say anything untrue; but he started an idea contrary to all the probabilities of the incident of which he was speaking, without a single fact to support it. We have not allowed ourselves to make any comparison or contrast between the witnesses in this case, either as to truthfulness or intelligence, or difference of condition. We do not think that the matters of which they spoke were above their comprehension, because every interrogation was brother-german to the occupation of all of them. They were all boatmen, very much of the same intelligence and character, and were employed by the parties to the suit to do their business, with an expectation if, in the navigation of the tug and her fleet, anything should occur leading to litigation, that they would have to resort to them to tell how it had happened. Such considerations should be kept in mind, in our judgments on such cases, and it should not be presumed, either in argument or judgment, that such classes of men have not a sense of truth fully up to their perception of moral obligation in its bearing upon those who do, from necessity, the rougher out-door work of life.

We have not been unmindful of the charge in the answer of the respondents, that the master of the barge had been careless in not making some effort to prevent her from sinking, and that the injury to her and to her cargo had been increased by the master and owner's negligence. No testimony of either can be found in the record. As to the damages and expenses accruing from repairs and the deterioration of the cargo, they were properly made the subject of a reference to a master. His report appears to have been done judiciously, and with the accustomed regularity of such a proceeding. The objection that he had excluded a witness, who was offered by the counsel of the respondents, we cannot consider here, because the proper course has not been taken in respect to it. There should have been a written statement upon oath as to the par-

*The Steamer New Philadelphia.*

ticulars which the witness.was offered to prove, that the court might have compared it with what had been already proved by the other witnesses of the respondents, to enable the court to determine whether it was independent or only cumulative proof.

As to the other exceptions to the sum reported by the referee, they were fully considered by the circuit judge who tried the appeal. They were rightly passed upon by him, and this court particularly instructs me to say, notwithstanding that the exceptions were properly taken and argued in the Circuit Court, that the subsequent admission of the report, in the aggregate, by the counsel, even though that was only with the intention to give *this court jurisdiction,* shall not be reduced here by denying it in detail for the purpose of taking it away.

Our conclusions in this case are, that the ebb tide was running strong when the steamer crossed it in going from the North into the East river, and that in making the Atlantic dock allowances were not made for the strength of the tide, so as to reach it with proper care and skill, and that the collision and sinking of the Owen Gorman were the results of her having been brought, by the steamer's fault, into collision with the sloop and the fender which was put out to ward off an impending blow, and the heavy pressure upon her by the steamer and the loaded barges which she had at that moment in tow. That, putting out the fender for such a purpose was no fault upon the part of the sloop, then lying fast at the dock; and, if there was any fault in doing so from the kind of fender which had been used, the rule of law is, that when a third party has sustained an injury to his property from the co-operating consequences of two causes, though the persons producing them may not be in intentional concert to occasion such a result, the injured person is entitled to compensation for his loss from either one or both of them, according to the circumstances of the incident, and particularly so from the one of the two who had undertaken to convey the property with care and skill to a place of destination, and there shall have been, in doing so, a deficiency in either.

The testimony in the case given by the libellant shows that

the Owen Gorman was tight, staunch, and strong at the time of the collision at the Atlantic dock; that, from the time of its happening and of the sinking of the barge did not exceed one hour, and that she sank in twenty minutes after she had been cast off by the steamer at her place of destination, and that there had been no collision between the barge and anything else while being towed to it by the steamer, nor any at that place, to justify a conclusion that the injury sustained by the barge had been occasioned there or anywhere else than at the Atlantic dock, in Brooklyn, and in the manner as it has been described by the libellant.

*Decree of the Circuit Court affirmed with costs.*