THE CHICKASAW.[1]

O'NEIL *et al.* v. MEMPHIS & W. R. PACKET Co. *et al.*

*(Circuit Court, W. D. Tennessee.   February 10, 1890.)*

1. COLLISION—STEAM-BOAT AT WHARF—DUTY TO PROTECT COAL-FLAT FROM DRIFT.

A steam-boat, while moored at a wharf, with no steam up, and engaged in receiving freight, ordered a supply of coal from coal dealers.   The dealers sent their tug with a coal-flat, which latter was lashed to the steamer's side, for the purpose of enabling the coal to be carried on board the boat.   It was the duty of the dealers to furnish the lines necessary for the lashing; but, not having enough, the boat allowed them to use one of hers.   After the flat was fastened to the boat, the tug left it, leaving on board two of the dealers' employes, whose duty it was to take care of the flat, to ascertain and report the quantity of coal taken, and, if anything happened

[1] Reversing 38 Fed. Rep. 358.

to the flat, or it should be in danger, to signal the tug. It was shown to have been the general understanding that the dealers were liable for the care and safety of their flats while thus engaged. *Held*, that it was not the duty of the steam-boat to protect the flat from floating drift.

2. SAME—RIGHT TO CUT LOOSE COAL-FLAT TO PROTECT HERSELF.
While the flat was thus lashed to the side of the steam-boat, it was struck by a large tree, which was being carried down by the current, and a hole was made in its bow. The flat began rapidly to fill, and in a few minutes was in a sinking condition. The dealers' employes had left the flat, and gone off to other vessels; and the boat's mate and the men employed in unloading the flat were compelled to quit hurriedly. The mate, believing that the flat would sink in a few minutes, and being apprehensive that when it did so it would dump its load, and would come up, by the force of the current, under the boat's hull and cause her to sink, cast it loose and allowed it to drift. It would have required some 20 minutes to have dropped the flat down stream, astern of the boat, even if the requisite lines had been at hand, which they were not. After the flat was cut loose, it righted itself, and floated down stream some 300 yards, and struck libelants' barge, sinking it. *Held*, that the boat had the right to protect herself by cutting the flat loose, and, having done so in the exercise of her best judgment, was not liable to libelants.

3. SAME.
The test as to whether the course taken by the boat's officers was negligent or unauthorized and reckless is that of good seamanship under the impending peril.

4. SAME.
The rule that a person may not save his own property by destroying another's has no application, as there was no design to shift the danger to the libelants' barge, nor was it contemplated that the flat would keep afloat after being cut loose.

5. SAME—BURDEN OF PROOF.
As the flat was not the boat's vessel either when moored or adrift, it was error to apply the rule to her that the burden is on the vessel adrift to excuse herself.

In Admiralty. Libel for damages. On appeal from district court. 38 Fed. Rep. 358.

*Turley & Wright*, for libelants.

*M. B. Trezevant*, for respondents.

JACKSON, J. The material facts of this case, as established by the proof before the district court, and by the additional evidence taken since the appeal to this court, are the following: On April 4, 1888, the steamer Chickasaw, a common carrier of freight and passengers, owned by the Memphis & White River Packet Company, was moored at its regular landing place at the port of Memphis, on the outside of the wharf-boat, where the water was from 60 to 70 feet in depth at the time. The river was high, and there was a good deal of drift floating. The current was from seven to eight miles per hour, and its course was from the Arkansas shore diagonally across the river to the Tennessee shore, which it struck with most force about or below Beale street, near which point O'Neil & Co.. had their regular landing for coal-barges. The Chickasaw was engaged in receiving freight preparatory to starting out on one of her usual trips. She had no steam up, except in the nigger engine, which was insufficient to move the boat, and was used in handling heavy freight. She was fully equipped and supplied with lines, all of which were in use in securing her moorings and fastenings except one. Her master, E. C. Postal, was temporarily absent, and the steamer was in charge of her mate, James Rice, who was a competent, first-class officer, of large experience, good character, and sound judgment. The master having previously notified an agent or employe of Brown & Jones, coal dealers

at Memphis, that the Chickasaw would need a supply of coal, a tug be-longing to said coal dealers, and in charge of a master employed by them, towed one of said Brown & Jones' coal-flats along-side of the Chickasaw, and made it secure to the steam-boat's out or larboard side. The coal-flat was lashed to the Chickasaw, by the agents of Brown & Jones, for the purpose of enabling the needed supply of coal to be taken therefrom on board the steamer. The owners of the coal-flat, or their agent, the master of the tug, in accordance with the established usage and custom of said port, were required to furnish the lines necessary to properly se-cure the flat. The master of the tug, on this occasion, used two short lines in lashing the coal-flat to the steamer; and the officer of the latter allowed or permitted him to use in addition its extra line, which was not needed in securing its own moorings. This extra line of the Chickasaw was run across, and secured on the upper larboard side of, the coal-flat. Having thus secured the coal-flat along-side of the Chickasaw, which was the usual manner of furnishing coal to steam-boats by all coal dealers in all stages of the river, whether such steam-boats were stationary at the wharf or in motion, the tug then left the coal-flat in charge of two em-ployes of said Brown & Jones, called "coal checkers," whose duty it was to look after and take care of said flat, and to see and report to their prin-cipals what quantity of coal was taken by the steamers. It was also their duty, in case anything happened to the coal-flat, or it should be in dan-ger, to signal for the tug. As stated by one of the witnesses, there was between the steam-boats and coal dealers an understood law—a general understanding—that the coal company were liable for the care and safety of their coal-flats while they were lying along-side of steam-boats not under way, and having no steam up. This general understanding was neither varied nor modified on this occasion by any agreement or under-standing between the officers of the Chickasaw and the agents of the dealers furnishing the coal-flat and coal. The Chickasaw required or desired only a portion of the coal on said flat; and, while the desired supply was being carried from the coal-flat aboard the steamer by an in-dependent contractor or stevedore and his men, a large tree came down with the current, its projecting limbs being in front, and its root up-stream, and struck the coal-flat at or near its upper outside or larboard corner, below the water-line, tearing or crushing a hole about 18 inches square in its larboard bow, through which the flat began rapidly to fill with water, and in a few minutes was in a sinking and dangerous con-dition. The two employes of Brown & Jones left in charge of the flat had gone off to other vessels, or points on the wharf, when the coal-flat was struck. The mate of the Chickasaw, standing upon the wharf-boat, attending to his duties, saw the floating tree about the time it struck the coal-flat, and immediately made an attempt to reach the leak, and do something to avert the threatened disaster; but the flat appeared to be sinking so rapidly, listing towards the starboard bow, and seeming about to go down "head first" in a few minutes, the mate and men engaged in carrying the coal aboard the steamer were compelled to quit it hurriedly. Believing that the flat would sink in a few minutes, the mate became

apprehensive that when she sunk she would dump her load of coal, and then, by the strength of the current, she would come up under or against the Chickasaw with such force as to crush or break in the steamer's hull, and cause her to sink. The coal upon the flat was placed in bins upon a floor which was raised considerably above the bottom of the flat. Being thus constructed and loaded, the probabilities were that in sinking, as she appeared to be doing, the flat would dump its load of coal, and then pop up under the Chickasaw with such force as to knock a hole in her hull. To avoid this threatened and imminent danger, the mate of the Chickasaw cast loose or cut the flat's fastenings, and allowed her to drift off, supposing, as others did who saw her condition, that she would sink, in all probability, by the time she cleared the Chickasaw. The lines which secured the coal-flat to the steamer would have tended greatly to bring about the result which the mate feared, if the flat had been allowed to remain along-side of the Chickasaw, in the way she seemed to be going down. It would have required from 15 to 20 minutes to have dropped the coal-flat down-stream astern of the Chickasaw, if the requisite lines had been at hand, and readily accessible, but the mate had no line at command suitable for the purpose, neither had the coal-flat; and, from the sinking condition of the flat, it did not appear that there was time to attempt this movement. The witnesses, who saw the actual situation as it occurred, did not consider that it would have been safe to have attempted to drop the coal-flat down, even if the requisite appliances had been at hand. The coal-flat, after being cut loose, did not sink as quickly as was expected. Upon being released from her fastenings, she partially righted herself, the water became more uniformly distributed through her hull, and, although still in a sinking condition, she floated down-stream; and about 300 yards below the Chickasaw she struck a coal-barge of the libelants, O'Neil & Co., which was sunk, and proved a total loss. The coal-barge of O'Neil & Co. which was sunk by the coal-flat of Brown & Jones stood out in the stream, with another barge intervening between it and the landing; and, in apprehension of danger from floating drift, an old gunwale, some 20 inches wide, projecting about 18 inches above the water, and 2 or 3 inches under water, had been extended diagonally across its front. Said old gunwale proved to be a wholly insufficient fender to ward off the drifting, sinking coal-flat of Brown & Jones, which seems to have struck the coal-barge lower down stream than this fender extended. Neither the Chickasaw nor the coal-flat of Brown & Jones put out any fender or boom to ward off drift when said coal flat was left along-side of the Chickasaw. It was not customary to do so. The steam-boats thus being furnished with coal required only an hour or two to take aboard such supply of coal as they needed. Several witnesses testify that, in the situation occupied by the Chickasaw and the coal-flat, it would have required a fender or boom two or three hundred feet in length to have effectually protected the coal-flat against danger from drift, and that a fender or boom of that length would have obstructed navigation, and interfered with vessels reaching the wharf at or near that point.

O'Neil & Co. filed their libel *in personam* against Brown & Jones, the Memphis & White River Packet Company, and E. C. Postal, master of the Chickasaw, alleging as their grounds of recovery that, as there was a high stage of water, with driftwood and trees floating in the river, and a heavy current running and driving such drift in that direction, the agents and employes of Brown & Jones, after fastening their flat to the Chickasaw with ropes, negligently and carelessly left the same so moored that the loss of libelants' coal-barge was entirely due and owing to the culpable negligence and carelessness of said Brown & Jones in not leaving and putting a proper watch and guard upon their said coal-flat, and preventing the same from being cut away, and from the negligence and carelessness of the mate and crew of the Chickasaw in cutting the fastenings which secured said flat to said steamer, and in sending the same adrift; and that there was no necessity for said mate and crew of the Chickasaw to cut loose from said coal-flat, and cast it adrift, in order to preserve and protect said steam-boat from danger, etc. Brown & Jones interposed exceptions in the nature of a demurrer to the libel. The other respondents answered, denying the negligence charged against them, setting up the circumstances as above detailed, under which the fastenings of the coal-flat were cut loose by the mate of the Chickasaw, and claiming that there was urgent necessity for the act, in the imminent danger which threatened the Chickasaw from the sinking flat, etc. Libelants dismissed their libel as to Brown & Jones. The case proceeded against the packet company and Postal, and after trial the district court rendered a decree against them for the value of libelants' coal-barge, and coal lost, amounting, with interest, to the sum of $2,260.15. Conceiving themselves aggrieved by said decree, respondents seek by their appeal to have the same reversed.

In the orderly consideration of respondents' (appellants') liability for the loss of libelants' coal-barge, under the circumstances stated, it is a matter of the first importance to determine what were the legal relations between the Chickasaw and the coal-flat of Brown & Jones, while the latter was lashed to the former for the purpose of furnishing the desired supply of coal to the steamer. The learned district judge found from the evidence introduced before the district court that said coal-flat was left solely to the care of the Chickasaw, without any one aboard to look after it, except that two coal checkers were on it to keep account of the coal taken, but had no other duty in relation to the flat whatever; that, the Chickasaw having assented to the coal-flat being placed or moored along-side for the purpose of procuring therefrom her needed supply of coal, said flat, for the time at least, became as much a part and parcel of herself as if she had borne it on her deck; that, under the principle applicable to tugs and tow, the Chickasaw was in charge of said flat as the commanding vessel; that she could have limited her liability by a contract with Brown & Jones that they should retain command and control of their flat, and be responsible for her navigation and management while delivering coal; that, not having done that, the

Chickasaw assumed entire control, and, under the circumstances, entire reponsibility for the flat's management and navigation. The fact that the two coal checkers, employes of Brown & Jones, were on the flat, was treated by the learned district judge as immaterial. From the relations thus found to have existed between the steamer and the coal-flat the district court reached the conclusions that the Chickasaw was in fault, and guilty of gross negligence, in failing to guard and protect the flat against drift; that ordinary prudence, tested by the reasonable requirement of caution, required the Chickasaw to provide against dangers to the coal-flat from floating drift; that she could not neglect that duty so as to imperil the property of others; and that no usage and custom of the port to the contrary, though known to and practiced by the libelants themselves, as the proof established, could relieve her from responsibility for such failure. It was further held by the district court that "it was negligence on the part of the Chickasaw not to hold the flat with a line, after it was struck by the floating tree, to keep it from drifting against helpless craft lying in the current below, and the excuse that no lines were at hand only shows that no adequate provision against such dangers as may be expected to occur was made;" that this was not reasonable, under the authorities, particularly under the rule applied in *The Clarita* and *The Clara*, 23 Wall. 1–15, where a tug whose business it was to give relief to vessels on fire voluntarily undertook to tow from her dock a burning ferry-boat, with a hempen hawser, which was burned, so that the burning ferry-boat got loose, and drifted against, and set fire to, a schooner at anchor. It was held that the tug was negligent in attempting to make the tow of the burning ferry-boat with only a manilla hawser; that, in undertaking such a service, she was bound to have chain hawsers or chain attachments on board, for the obvious reason, which ordinary experience and prudence would have suggested, that the part of the manilla hawser made fast to the burning boat could not be relied on to resist the effects of the fire, but was liable to be burned. For this negligence, the tug was held responsible for the damages to the schooner at anchor, while the ferry-boat was exempted from liability. The principle of this *Clarita Case* was thought by the district court to impose upon the Chickasaw the duty of having aboard, and ready for use, suitable lines and proper appliances, such as would have enabled her mate and crew to have dropped the sinking coal-flat down and astern of the vessel, and that it was negligence not to have anticipated the danger, and made such previous preparations to avoid the same as to have met it without imperiling others. Continuing with the assumption that the coal-flat was in charge, and under the control and management and navigation, of the Chickasaw, it is further said:

"If steam-boats coal themselves from flats in a crowded harbor, they must use all reasonable precaution against the breaking loose of the flats; and I do not think they can, under any circumstances, voluntarily cut them loose to save themselves, without undertaking to answer all damages that shall come by the act to others who are in no way connected with them, or interested in the danger they seek to avert."

After a careful examination of the record, I am unable to concur with the district judge in respect to the relations which he found to exist between the Chickasaw and the coal-flat, and from which the conclusion was reached that it was the duty of the former to protect the latter against danger from floating drift, and that the steamer's failure to provide such protection was negligence which rendered her liable to libelants. The actual and legal relationship between the two boats is made much clearer by the additional proof taken on behalf of appellants since the appeal, than was shown by the evidence introduced before the district court. This additional proof rendered it perfectly clear that the Chick-Chickasaw neither expressly nor impliedly assumed any custody or control over the coal-flat; neither was she in any way responsible for its management and navigation. On the contrary, the evidence established that the coal-flat was wholly and exclusively under the control, management, and navigation of its owners or their agents; that, at the time of mooring to the Chickasaw, it was left in charge of two employes of Brown & Jones, with the duty of looking after and taking care of the flat. Instructions to that effect were given them by the master of the tug which brought the flat along-side of, and fastened it to, the steamer. This tug, also belonging to Brown & Jones, furnished, and was expected to furnish, the motive power for the flat's navigation; and it was accordingly made a part of the duty of the two employes left in charge of the flat, in the event of danger thereto, to signal for the tug, which was in more or less easy reach. There was no obligation on the part of the Chickasaw to furnish any motive power for the movement of the flat. She was herself in a helpless condition,—moored to the wharf, with no steam up. She undertook to perform no service for the benefit of the flat, had no authority to displace the two employes left in charge of it, and substitute other watchmen; neither could she control their movements and actions. The two boats were wholly independent of each other. The sole duty which the Chickasaw owed to the owners of the flat was that of reasonable dispatch in taking from the latter her needed supply of coal. The two boats, separately owned, with different and distinct crews, employed and paid by the respective owners, with no right or authority on the part of either to displace such crews upon the vessel of the other, and with no agreement or undertaking between them for the performance of any service by the one for the other, cannot properly be said to occupy a dependent relation, such as will impose upon the one duty of protecting the other against outside danger, by reason of mere juxtaposition for the purpose of transferring cargo or a supply of fuel from one to the other. It is shown by the proof that the duty rested upon the coal-flats, in such cases, to furnish their own fastenings, and to properly moor their own craft, and that steam-boats never undertook to provide a supply of lines for their use. But, in the present case, the tug, needing another fastening in order to securely moor the flat, was allowed to use the Chickasaw's extra line, not needed in securing her own moorings. This loan of her line by the Chickasaw cannot be construed as the assertion

of any control over the flat. Such was not the intention of the parties. Again, it is expressly shown by Capt. Postal that the owner of the coal-flat thus fastened to the steam-boat for the purpose of furnishing them with coal takes the chance of the flat being sunk or injured by the perils of the river. He further states that there was "a general understanding between us that the coal company is liable for the care and safety of their flats while they are laying 'long-side of our boats, steam-boats not under way, and having no steam up." Under this general understanding between steam-boats and coal dealers, and in view of the fact that, in conformity therewith, two employes of the owners were actually left in charge, to look after and take care of the flat, as well as to see what quantity of coal was taken therefrom by the steamer, and also to signal the flat's tug companion for help when needed, it cannot be properly held that the Chickasaw was under any duty or obligation to Brown & Jones to guard and protect their said coal-flat against dangers from floating drift. If the coal-flat had sunk when struck by the floating tree, and while moored to the Chickasaw, would the latter have been liable to Brown & Jones for the loss because of her failure to provide protection against such danger? The rule of duty and of liability laid down by the district judge seems to go to that extent, but surely the Chickasaw could not be held responsible to Brown & Jones in the case supposed. I have found no authority which would support such a proposition, and can see no reason or principle on which to rest such a responsibility. Had Brown & Jones the right to remove their tug (the motive power for the proper management and navigation of the coal-flat) for their own convenience, and for their own advantage and profit leave the flat moored to the Chickasaw, in charge of two employes, who shortly afterwards quit their post to look after other business of their principals, and, in the absence of express contract, cast upon the Chickasaw the duty and burden of guarding and protecting said flat against known dangers and perils of the river? I know of no law which supports such a proposition. No case cited by counsel or the learned district judge goes to that extent. It will hardly be claimed that the Chickasaw, under the circumstances of her situation, owed to the public or to libelants a higher measure of duty in providing protection to the coal-flat against danger of the river than she owed to Brown & Jones as owners of the flat. Such a claim would rest upon no sound principle, and finds no support in the authorities. If there was, under the facts of this case, any duty or legal requirement to guard the coal-flat against such perils as it encountered from floating drift, that duty rested upon the general owners of the flat, in whose charge, control, and management it remained; and whatever of responsibility arises from the failure to perform such requirements, or take proper precautions to prevent such danger, attached to Brown & Jones, and not to the Chickasaw. The latter cannot be held chargeable with negligence for not providing a fender or boom, or other protection against floating drift striking the coal-flat, which occupied the position and relation of an independent vessel, wholly in charge of its owners, and

over which the Chickasaw possessed no authority, control, or management, and in respect to which she had undertaken to perform no service whatever.

It remains to be determined whether the Chickasaw is liable for cutting loose the flat. That question involves the consideration of two leading propositions: *First*, was the act of the mate in cutting the flat's fastenings, under the circumstances, unlawful or wrongful? and, *secondly*, if lawful, was it negligently, rashly, or carelessly done, without a proper regard for the rights of others? After being struck by the floating tree, the flat, in the judgment of experienced officers and river men, was sinking rapidly,—toppling over on the larboard bow, going down "head first,"—and to all appearances would sink in three or four minutes. In sinking, it would, in all probability, turn over, dump its load of coal, and then, by force of the current, depth of water, and influence of its moorings, it would pop up under, and break a hole in, the hull of the Chickasaw, and thus cause her to sink. To have dropped the flat down and astern of the Chickasaw, if that could have been done at all, would have required 15 or 20 minutes, with all necessary lines and appliances at hand. Neither the Chickasaw nor the flat had the requisite lines to have accomplished this maneuver; nor was the Chickasaw under any obligation to have provided such lines as a matter of precaution. In this situation of affairs, the flat having, by a peril of the river against which the steamer was under no duty to guard or protect it, become not only helpless, with her sole motive power withdrawn, but placed in a position which threatened the Chickasaw with impending and serious collision, was the Chickasaw bound, either to its owners or to the public, to allow the fastenings to stand, and take the consequences? Or had she the right to ward off from herself this threatened collision from an independent craft? I am clearly of the opinion that, in view of her relations to and connection with the coal-flat, as above stated, the Chickasaw had the right to protect itself against such a threatened collision by cutting the flat's moorings, or by any other prudent and reasonable method open to her adoption in an emergency. It could not be doubted for a moment that, if the coal-flat had not intervened, the Chickasaw could lawfully have warded off the floating tree, though in so doing it might have received such a direction as by means of the current would have carried it against, and sunk, libelants' coal-barge. In that case, the Chickasaw could not have been made liable for the loss. Suppose the coal-flat, before its moorings were completed, had from any cause commenced sinking. Could not the Chickasaw have shoved it off without incurring liabilities to others for the injury it might occasion to others while drifting? There can hardly be any question as to her right so to do. How can the Chickasaw's assent or permission for the flat to secure itself by attaching temporary fastenings to her side change the steamer's right to protect herself against danger from the flat? The two craft owed no duties or obligations to each other, as vessels, either before or after being so moored together, except that neither should occasion injury to the other wrongfully or negligently. In the *Case of The Steamer New*

*Philadelphia*, 1 Black, 62, a steam-tug having a coal-barge in tow was so carelessly navigated that the barge was in danger of striking a sloop lying fast at anchor. In order to prevent the threatened collision, the sloop put out a fender which crushed into and so injured the barge that she soon after filled and sunk. It was held that the act of the sloop in putting out the fender for the purpose of warding off the collision was no fault on the part of the sloop. The fender used for the purpose of warding off the impending blow was not of the best and safest character that could have been used. There is nothing in the situation occupied by the Chickasaw, or in her relation to the independent coal-flat, which should deprive her of the like right to ward off impending collision from the flat. Brown & Jones, having retained entire control of their flat, with the general understanding that they were liable for its care and safety while lying along-side of the steamer moored to the wharf, and with no steam up, and having voluntarily withdrawn their tug from the flat, which they leave in charge of two employes, who quit their post, looking after other business of their principals, could not have held the Chickasaw liable for cutting the flat loose, under the facts and circumstances stated, if it had proved a total loss. The Chickasaw, having the lawful right, as against its owners, to defend and protect herself against the impending collision from the apparently sinking flat, her mate, in the emergency of the danger, and in exercise of his best judgment as to the method of defense or protection to be employed, might lawfully, as against all parties, cut the lines which secured the flat to the steamer.

It is alleged in the libel, and claimed in argument, that the action of the mate was not necessary for the preservation and protection of the Chickasaw, and it is said that he "substituted a fancied for a real necessity." In *The Amethyst*, 2 Ware, 20, it is very properly said that the prudence and propriety of most actions are not to be judged by the result, but by the circumstances under which they act. If they act with reasonable prudence and good judgment in a situation calling for and requiring prompt action, they are not to be made responsible because the result from causes that could not be foreseen nor reasonably anticipated, has disappointed their expectations.

The fact that the flat kept afloat long enough to cause the disaster to libelants' barge undoubtedly tends to show that the mate was in error in thinking it would sink in a few minutes after being cut adrift, but the propriety of his actions should not be determined by the result. The standard by which to test the question as to whether the course taken by the mate was negligent or unauthorized and reckless is that of good seamanship under the impending peril. The owner of a vessel does not engage for the infallibility of the master, "nor that he shall do in an emergency precisely what, after the event, others may think would have been best." *Lawrence* v. *Minturn*, 17 How. 100; *The Star of Hope*, 9 Wall. 230. Applying this rule to the conduct of the Chickasaw's mate, there can be little or no doubt that, from the situation and condition of the flat, he had very reasonable ground for the belief that it would quickly sink, thereby greatly imperiling the steamer, and that there was con-

sequently an urgent and imperative necessity to cut it loose in order to protect or save the Chickasaw. In thus exercising a lawful right, was the mate's action so negligently, recklessly, or carelessly performed as to render the Chickasaw liable for the injuries thence resulting? The mate supposed, and had every reason to believe, that the flat would sink by the time she cleared the Chickasaw. If he knew, or had good reason to believe, that in cutting the flat adrift he was thereby putting the libelant's coal-barge in peril, some foundation would be given to the claim that he acted negligently or recklessly. The Chickasaw is not properly to be put into the position of taking the alternative of paying the damages to libelant's property, rather than incur a greater damage to herself unless the injury to libelants' property was the natural and probable consequence to be anticipated from cutting the flat adrift. A person may not save his own property by destroying another's. This is undoubtedly a sound proposition. But the present case does not call for its application. There was no design or intention to shift from herself to libelants' barge the danger which threatened her from the sinking coal-flat of Brown & Jones; nor did she or her officers, in warding off the impending collision from the coal-flat by cutting its fastenings, contemplate, as the probable consequence of their act, that injury would result to libelants, or any one else. The reasonable expectation of all who saw the condition of the coal-flat was that it would speedily sink; that it could not keep afloat but two or three minutes, and would go down long before reaching the libelants' coal-barge. Having the lawful right to cut loose the flat, it cannot be said that there was either negligent or reckless action towards libelants in the manner in which the right was exercised. It is not deemed necessary to go into an examination of the decisions relating to the respective rights and liabilities of tugs and tows, for the reason that no such relation existed between the Chickasaw and the coal-flat. But, if it were conceded that there was between the two some relation analogous to that of tug and tow, it would by no means follow that the Chickasaw would not have the right to cut the flat adrift in order to protect and preserve herself against impending perils of navigation, or other serious dangers, not arising from her own fault. The tug, or steamer occupying the position of a tug, is neither a common carrier nor an insurer of the tow, and, in performing the service of transportation undertaken, is only bound to the exercise of ordinary care, prudence, and skill; and whenever, in the course of such service, the tug's own safety is endangered by perils of the sea or rivers, or from causes not due to its own fault, the tug may, as a matter of self-preservation, cut the tow loose without liability or responsibility for the consequent loss of either the tow or its cargo. *The J. P. Donaldson,* 19 Fed. Rep. 264, is an illustration of the application of this right on the part of the propelling vessel. There it was held by the learned district judge before whom the case was heard that the tug was not guilty of negligence in sacrificing its tow for its own preservation and safety. The case was appealed to the circuit court, where it was heard by Circuit Justice MATTHEWS, who concurred in the conclusion that the tug,

being in peril without its own fault, was not guilty of negligence in cutting its tow adrift; but he held the tug liable to contribute towards the loss on the basis of a general average. It was ruled by Mr. Justice MATTHEWS that the right of general average contribution depended upon an equity arising out of the relation of the parties, and did not arise out of the contract of carriage. He, however, further held this principle of general average contribution was not applicable between strangers, but only between those associated together in a common adventure, and placed under the charge of a master, with authority to act in emergencies as the agent of all concerned. The Chickasaw and her officers occupied no such position towards either the coal-flat of Brown & Jones or the coal-barge of libelants. So that the present case could not fall within the enlarged principle of general average contribution announced by Mr. Justice MATTHEWS in *The J. P. Donaldson* or *Sonsmith* v. *The J. P. Donaldson,* 21 Fed. Rep. 671, the correctness of which the writer personally knows that Mr. Justice MATTHEWS subsequently doubted. I do not understand that the doctrine of excusable error *in extremis* is limited, as suggested by the district judge, in its application, to cases where the contributing mismanagement of the party injured caused or occasioned the extremity. The doctrine is of wider application than that, as shown in the *Case of The J. P. Donaldson,* and others that might be cited.

The learned district judge correctly stated that "the burden of proof is on the vessel adrift to excuse herself, and *prima facie* she is negligent unless her owners can show due diligence when she collides with one harmlessly and faultlessly at anchor;" citing *The Louisiana,* 3 Wall. 164; *The Jeremiah Godfrey,* 17 Fed. Rep. 738, and other authorities. Then, treating the drifting flat as the Chickasaw's vessel, the conclusion is reached that she has not answered or met this burden of proof, or relieved herself of the imputation of negligence arising from the flat's being adrift. It has been shown that the flat was not the Chickasaw's vessel either while moored or adrift, so that the rule involved did not apply to the Chickasaw, but to Brown & Jones, the general owners of the drifting flat. If they had been proceeded against, the burden of proof would have devolved upon them to rebut the *prima facie* liability arising from their vessel being afloat. They could have met that *prima facie* liability by showing that the Chickasaw, either wrongfully, or negligently and recklessly, without fault on their part, cut the flat adrift. But suppose, in attempting to place the blame on the Chickasaw, the latter had shown, as she has done in this case, that her action in cutting the flat adrift was lawful; that in so doing she was guilty of no wrong or neglect towards Brown & Jones. Could it be properly said that they had shifted the *prima facie* responsibility for the disaster from themselves to the Chickasaw? It would be difficult to maintain such a position.

I am unable to see any reason or ground upon which the personal decree against Capt. E. C. Postal, the master of the Chickasaw, can be rested. The libel states that at the time of the transaction he was

temporarily absent from the Chickasaw, and that the mate, James Rice, was temporarily in charge. It is neither claimed nor shown that the master's absence was unauthorized, wrongful, or negligent. It is not alleged or shown that he had any connection whatever with the negligent acts charged against the steamer, or her owners. He does not appear to have given the mate any commands or direction in reference to the flat. The mate was not acting as his agent in what he did, but as the agent and employe of the owner of the Chickasaw; and how the absent master can be held responsible personally, under the circumstances, for the action of the mate in command, I cannot see. But, aside from this, when it is established that the action of the mate was lawful, and not performed in a negligent and reckless manner, that will relieve the master as well as the Chickasaw.

In the opinion of this court, no fault or negligence on the part of appellants in not protecting the flat against floating drift, in cutting the flat loose under the circumstances, is established. It follows that the decree of the district court is erroneous, and should be reversed, which is accordingly so ordered and adjudged, and that the libel be and is hereby dismissed at libelants' cost.