THE PAVONIA.[1]

HOBOKEN LAND & IMP. CO. *v.* THE PAVONIA.

(*Circuit Court, S. D. New York.   December 5, 1885.*)

1. COLLISION—OBLIGATIONS OF FERRY-BOATS WHEN APPROACHING SLIPS.
    The ferry-boats Pavonia and Weehawken had slips on the New York side about 750 feet apart, that of the Weehawken being the lower.   The location of the slips on the other side of the river was such that the courses of the two boats crossed.   In consequence it was customary for the Weehawken to give the Pavonia, on the New York side, the right of way from the time she commenced to swing for her slip.   When the tide was flood, the Pavonia usually commenced to swing for her slip when below it and to drift up with the tide. This sometimes made it more convenient for the Weehawken to go inside of the Pavonia and to keep up the river between the Pavonia and her slip.   The collision occurred on the New York side, and about 200 feet from the entrance to the Pavonia's slip.   The Pavonia had begun to swing for her slip before the collision occurred.   The tide was flood, but the direction and force of the wind were such that it was not necessary for the Pavonia to go as far below her slip as was usual with the flood-tide.   The Weehawken had been coming up the river at a distance of between 100 and 200 feet out in the channel, and was inside of and between the Pavonia and the line of slips at the time of collision.   *Held,* that the Weehawken was not justified in departing from the established practice of the boats by which the Pavonia was entitled to the right of way to her slip, and was in fault in attempting to cross the bows of the latter vessel when swinging to her slip.

2. RULE, IRRESPECTIVE OF USAGE.
    The case falls under the operation of the twenty-fourth rule of navigation, and the regulations of supervising inspectors do not apply.   Irrespective of usage, general considerations of convenience and prudence demand that a ferry-boat having ample room to do so should keep out of the way of another about entering her slip, or in such close proximity to it that she has made her final preparatory movements to enter.   If the circumstances require her to make a circuitous swing to conform to the varying condition of wind and tide, she should not be embarrassed by the presence of another boat in such close proximity to her as to involve risk of collision if any miscalculation or unforeseen emergency should occur.

3. RULE AS TO SIGNALS.
    When the boat having the right of way fails to respond to the signal of the boat whose duty it is to keep out of the way, the latter has no right to assume, because of such silence, that the former abandons her right of way.

4. DEFECTIVE LOOKOUT.
    When there are no obstacles in the way, the fact that the approaching vessel is not seen is all that is necessary to impute negligence on the part of the lookout.   Both vessels having been negligent, and the collision having been caused thereby, the damages will be divided.

In Admiralty.

*Abbett & Fuller,* for libelant and appellant.

The Weehawken violated no rule or regulation in taking a course parallel to the line of slips and between the Pavonia and her slip before there was any danger of collision.   The Weehawken, having seen the Pavonia's red light on her port bow before the latter had swung any considerable distance, had a right to assume that the Weehawken was at the same time seen by the Pavonia.   The lights then being red to red it was the Weehawken's duty to go ahead.   The collision was

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

caused by reason of the negligence of the Pavonia's lookout, and by her subsequent faulty maneuver.

*F. A. Wilcox*, for claimant and appellant.

The Weehawken knew the Pavonia's usual manner of entering her slip, and having seen her should have kept out of the way. The Weehawken was running too near the ends of the piers, and at a too high rate of speed. *The Edwin H. Webster*, 22 Fed. Rep. 171; *The Uncle Abe*, 18 Fed. Rep. 270; *The Maryland*, 19 Fed. Rep. 551; *The Favorita*, 8 Blatchf. 540; *The Chesapeake*, 1 Ben. 23. The Weehawken was in fault in leaving her slip without giving a warning whistle, and also in not giving any whistle until a collision was inevitable.

WALLACE, J. This libel is filed by the owners of the ferry-boat Weehawken to recover damages sustained by a collision between that boat and the ferry-boat Pavonia. The collision took place on the North river on the fifteenth day of October, 1883, at about 6:30 P. M., on a clear moonlight evening. The tide was strong flood, running three miles an hour, and there was a heavy north-west wind. There were no vessels or intervening obstacles to obstruct the movements of the ferry-boats from the time when they ought to have distinctly seen each other at a sufficient distance to avoid danger to the time of the collision. The Pavonia was making one of her regular trips from Jersey City down and across the river to her slip at Chambers street, and the Weehawken had left her slip at the foot of Barclay street to make one of her regular trips up and across the river to Hoboken. The slips of the two boats on the New York side were about 750 feet apart, the Barclay slip being the lower or southerly one.

The boats were each about 215 feet long. In making their trips each crossed the other's course, the slip of the Pavonia being below the slip of the Weehawken on the New Jersey side of the river. It was the custom between the boats to allow the right of way to the Pavonia from the time she commenced to swing for her slip. It was usual, however, when she was making her slip on the New York side with a strong flood-tide, for her to commence to swing below it sufficiently far in view of the existing tide and wind to drift upward into it with the tide, and this practice sometimes made it more convenient for the Weehawken to go inside the Pavonia and keep up the river between the Pavonia and her slip. Each boat was aware of the practice of the other, which was equivalent to an understanding between them that the Weehawken should keep out of the way when the Pavonia was swinging for her slip unless she was so far below her slip and so far out in the river that it was safe for the Weehawken to pass between her and her slip. The case turns mainly on the question whether, on the occasion in controversy, the Weehawken was justified in keeping up the river between the Pavonia and her slip, thus crossing the Pavonia's bow as she was about to swing for her slip, or whether it was the Weehawken's duty to keep out of the way by passing under the Pavonia's stern, or by stopping or reversing.

As the Pavonia left her slip at Jersey City the ferry-boat Secaucus was proceeding down the river about in the middle of the channel, and the Pavonia came abreast of her, and they proceeded abreast of each other for a short distance, when the Secaucus slowed and let the Pavonia cross her bow in order to reach the slip. The Pavonia was then about 600 yards from her slip, and thereupon the Pavonia made for the New York shore, swinging gradually from southerly to south-easterly, until, when somewhat below her slip, she began to swing sharply to the eastward to make the slip. Her slip was 200 feet wide, with two divisions, and she intended to make the upper division, as the lower division was occupied by her companion boat, the Delaware. Owing to the wind prevailing at the time, she did not go as far below her slip in order to swing up to it as she usually did on a flood-tide, and it was not necessary to do so.

The Weehawken emerged from her slip soon after the Pavonia passed across the bow of the Secaucus. The pilot of the Weehawken, assuming that the Pavonia would go further below her slip before swinging to drift upward on the flood-tide into her slip than she in fact did, supposed he could pass between the Pavonia and her slip before the Pavonia would be brought so near the Weehawken as to be perilous. He accordingly headed his boat to a southerly course. After he straightened on his course he signaled the Pavonia by one blast of his whistle that he would keep inside. That signal was not heard by the Pavonia. The pilot of the Weehawken, hearing no response from the Pavonia, immediately repeated his signal. This signal was not heard by the Pavonia, and the pilot of the Weehawken then blew an alarm whistle, and directed his engineer to stop and reverse, and ported his wheel. When this whistle was given the Pavonia was swinging easterly to the north-east for her slip; while the Weehawken, which had been going at nearly full speed, making with the flood-tide 12 miles an hour, was rapidly approaching the Pavonia on an intersecting course, and was so near the entrance of the Pavonia's slip that before her headway could be stopped she was almost opposite the slip and directly in the path of the Pavonia. The Weehawken had been coming up the river at a distance of between 100 and 200 feet out in the channel. The boats came into collision at a point about 200 feet off the southerly side of the lower division of the Pavonia's slip, the port bow of the Weehawken coming in contact with the starboard bow of the Pavonia.

The distance the two boats were apart at the time the Weehawken first signaled to the Pavonia cannot be reliably determined. It is very clear that the period of time intervening between that signal and the time of the collision was very short. Assuming that the Weehawken had made 750 feet from her slip when the boats came together, about 50 seconds intervened. But the proximity of the boats at the time of the first signal was probably considerably nearer than it would seem to be from calculations based on the time occupied by

the Weehawken in getting from her slip to the point of collision. The testimony of the Weehawken's pilot is that his signals were given with great rapidity. He thinks that not more than three seconds intervened between his first and second signals, and not more than two seconds between his second signal and his alarm signal, and that the alarm whistle was given within two seconds after giving his second signal. Of course accuracy is not to be predicated of such testimony, but his testimony shows very satisfactorily that but an extremely short interval could have elapsed between the time of the first signal and the collision. It is probable his first signal was not given until his boat had got out from 100 to 200 feet beyond the end of her slip and had got straightened on her southerly course up the river, and that less than half a minute elapsed between the time of this signal and the time of the collision. As the collision took place about 200 feet off the southerly end of the Pavonia's slip, it would seem that the Pavonia had commenced to swing sharply for her slip and was not more than three times her length from it when the first signal was given by the Weehawken.

The pilot of the Weehawken says he saw the red light in the Pavonia when he gave his first signal. The probability is that he saw this light as his boat was starting out of her slip, and, assuming the Pavonia to be far enough away for him to go inside, did not give his signal as soon as he thinks he did, and did not give it, in fact, until his boat was straightened on her course up the river. He probably was within two boat's length of the place of collision at the time. Under the circumstances the Weehawken was plainly in fault in departing from the established practice between the boats by which the Pavonia was entitled to the right of way to her slip, and in attempting to pass across the bows of the Pavonia just as she was swinging into her slip. The fault was aggravated by proceeding after having signaled the Pavonia and got no response. She had no right to assume, without an assenting signal from the Pavonia, that the Pavonia consented to abandon her usual right of way. Without such consent the Weehawken assumed the risk of departing from the usage between the boats, and of being able to justify her course by showing that it was safe under the circumstances. The regulations of the board of supervising inspectors do not apply to the case, because the boats had adopted a practice which was a law unto themselves. The case falls under the operation of the twenty-fourth rule of navigation, and a departure from the ordinary rules was required by a due regard to the special circumstances.

Irrespective of any usage, it should be held, upon general considerations of convenience and prudence, to be the duty of a ferry-boat having ample room to do so to keep out of the way of another just about entering her slip, or in such proximity to it that she has made her final preparatory movements to enter it, when the circumstances require her to make a circuitous swing against the tide to reach it.

The boat about to enter her slip under such circumstances must conform her movements to the varying conditions of the tide and wind, and is necessarily more or less circumscribed by the exigencies of the moment; and she ought not to be unnecessarily embarrassed by the presence between her and her slip of another boat in such proximity as to involve risk of collision if any miscalculation or unforeseen emergency occurs.

It is evident from the testimony of the Weehawken's pilot that his signal of one whistle was intended as a proposal to the Pavonia that he might pass inside. He expected an answer, and repeated his signal when the first was not answered. At the time his first signal was given the circumstances required him either to go outside or to stop and reverse. The boats were approaching each other in a direction and with a rapidity that rendered a collision highly probable, if not unavoidable, unless one or the other reversed, or unless the Weehawken gave the Pavonia the right of way to her slip. The Pavonia was also in fault. It was her duty while navigating this crowded channel to maintain a vigilant lookout. Especially was it her duty, being somewhat late on her own trip and knowing the usual time for the Weehawken to leave her slip, to be observant of the movements of the Weehawken. There was no efficient lookout on the Pavonia. The deck hand who is called the lookout was not acting as a lookout at the time. He had other duties to perform, and was not in the proper place for a lookout under the circumstances. He testifies that he was standing near the hood of the boat, between the cabin door and the end of the boat, and heard four sharp bells given, when he went forward to the bow of the boat and then saw the Weehawken for the first time. The boats were then close together. He testifies they were about 100 feet apart. The pilot, as he himself testifies, was necessarily occupied with his wheel from the time of commencing swinging to the slip. He did not see the Weehawken until her bow was just lapping on the Pavonia's water-wheel, and when his boat was half a length only from the Weehawken. There was no obstacle in the way of seeing the Weehawken all the time after she emerged from her slip to the time of the collision. The fact that she was not seen is all that is necessary to impute negligence to the Pavonia. If, after the Pavonia had commenced to swing for her slip, she had seen the red light of the Weehawken, as she should have done, indicating that the Weehawken was intending to pass inside, she could have been stopped and reversed, and the Weehawken would have got by the point of collision before the boats came in contact.

The decree of the district court dividing the damages is affirmed, with interest and costs.