## THE SOSUA.

## THE HAINESPORT.

(District Court, E. D. Pennsylvania.   March 15, 1921.)

No. 60 of 1920.

**1. Collision ☞71(3)—Failure to keep lookout or give signals is fault.**

A loaded steamship, passing up Delaware river at night on a flood tide and without a lookout, which, after reaching Philadelphia, overtook and passed a tug with five barges in tow, going within 75 feet on the port side of the tug, and after proceeding a short distance further across the course of the tug anchored about mid-stream, allowing her stern to swing across the channel, all such maneuvers having been made without warning signals, *held* in fault for a collision with one of the barges of the following tow. The tug, which did all possible to avoid collision after discovering that the steamship had stopped in the fairway, *held* not in fault.

**2. Collision ☞71(3)—Navigable waters ☞23—Obstruction by anchoring in fairway.**

The anchoring of a steamship near the middle of Delaware river in the night, without warning signals and only a few hundred feet in front of a tug following with a tow, *held* a violation of Act March 3, 1899, c. 425, § 15 (Comp. St. § 9920), making it unlawful to anchor in navigable channels "in such a manner as to prevent or obstruct the passage of other vessels."

In Admiralty.   Suit for collision by the Frugart Aktieselkabet, owner of the Norwegian steamship Sosua, against the steam tug Hainesport.   Decree for respondent.

H. Alan Dawson, of Philadelphia, Pa., and Haight, Sandford, Smith & Griffin, of New York City, for libelant.

Willard M. Harris, of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. [1] The collision which is the subject of the present suit occurred about 11 o'clock on the night of April 19, 1920, in the Delaware river, between Philadelphia and Camden.

The Sosua is a Norwegian steamship, about 240 feet in length over all, and had come up the river loaded with a cargo of fruit, to be landed at the piers of the United Fruit Company at the foot of Arch street, Philadelphia.   The tide was flood; the weather clear; the night dark.   It being too late for the Sosua to be towed into her berth, she cast anchor in the channel slightly above the Arch street piers.

The Hainesport, having in tow five light barges in two tiers, three on the port and two on the starboard side, had proceeded up the river from Gloucester, and, directly after the Sosua had dropped her anchor, attempted to pass her stern, when the bow of the forward starboard barge came into collision with the Sosua, striking her starboard quarter underneath the stern and her rudder, causing injury to her plates and rudder.

The libelant's contention is that the collision was due to the negligence of the Hainesport in running too close to the Sosua without warning, after her anchor had been dropped and she was lying with her bow downstream, angling towards the New Jersey shore with

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

her stern about midstream. The respondent's contention is that the collision was due to the negligent and careless maneuvers of the Sosua in passing the Hainesport on her port side at or slightly below Walnut street without signal, crossing her bow at an angle, and proceeding to her anchorage without warning to the Hainesport, and, while in a position across the channel, backing into the barge.

One of the disputes of fact in the case concerns the point where the Sosua passed the Hainesport and her tow in coming up the river. The importance of this lies in its bearing upon the question whether the Sosua was lying at anchor at the time of the collision, or whether she was still swinging her stern into position to lie with her bow downstream. If, as claimed by the libelant, the Sosua passed the Hainesport opposite the New York Shipbuilding plant, some miles downstream, it is contended, because of the time she would have to get out of the way, that she had already anchored and come to rest some time before the Hainesport approached, and it therefore claimed the running down of an anchored steamship through the negligence of the Hainesport. If, on the other hand, the place of passing was opposite Walnut street, as claimed by the respondent, it strengthens the contention that the Sosua negligently anchored in mid-stream directly in the course of the Hainesport and her tow, and swung around and backed into the tow.

Upon this point the testimony of the respective sides has been closely examined. The master of the Sosua, Capt. Petersen, had no knowledge or recollection of passing the Hainesport and her tow, or any other vessels. Nilsen, the second mate, testified to the same effect. The testimony of these witnesses was taken by deposition over four months prior to the trial. The libelant's only witness at the trial was Pilot Preston Josephs, who was in charge of the vessel on the night in question. He testified that just above the Greenwich coal pier, about the New York shipyard, he passed a tug with some lighters, and that he thought it was the same tug. As against his uncorroborated and uncertain statement, we have the positive testimony of the respondent's witnesses that, as the Hainesport and her tow were coming up the river, the Sosua overtook her, and, without any signal, passed her about 75 feet off her port side at about Walnut street. The master of the tug testified that, after the steamer's stern had cleared the tug, he looked straight up Walnut street and saw the street lights. The lookout testified to passing at the same place as did also the fireman. This testimony, coming from those on board the smaller vessel, all to the same effect, is entitled to credence as against the uncorroborated testimony of the pilot of the Sosua.

Moreover, the Sosua, according to the admission of libelant's witnesses, had no lookout on watch with the duty of observing other vessels she passed, while the Hainesport's duty in that respect was complied with. Pilot Joseph's testimony is to the effect that, when he passed the Walnut street wharf, he was proceeding on the Pennsylvania side about the length of the courtroom from the Walnut street dock. The length of the courtroom is between 68 and 70 feet, although the witness estimated it first at 240 and then at 200 feet. His testimony as

to his proximity to the Walnut street dock corroborates to some extent the testimony of the respondent's witnesses.

It is found as a fact that the passing was immediately below the Walnut street dock, as Walnut street was not seen by those on board the Hainesport until after the stern of the Sosua had gone by. The Sosua, having passed the Hainesport, ported her helm, crossed the bow of the Hainesport at an angle, and, after crossing, kept on an oblique course in the channel towards the New Jersey shore. The Sosua's rate of speed was a knot or two faster than that of the Hainesport. Witnesses for the libelant testified that a Chestnut street ferryboat sounded her slip whistle, and the Sosua stopped her engines for two or three minutes to allow her to go by. Witnesses for the respondent testified that a Market street ferryboat passed in front of the tug and the steamer.

It is hardly probable a steamship would have to stop her engines for such a period of time to allow the passage of a ferryboat. If she did stop, however, it must have been a much shorter stop than two or three minutes. Having approached a point about opposite Arch street, the Sosua ported her helm, reversed her engines, swung around across the channel to starboard, and dropped her anchor. There is dispute in the testimony as to whether she dropped her anchor before reversing. It is improbable that a loaded vessel on a flood tide would have dropped her anchor without checking her speed. The witness for the Hainesport testified that the Sosua's engines were reversed and she was coming back when the collision occurred. Whether she was actually reversing or not, at the time of the collision, I do not regard as of special importance. The fact is uncontradicted that the Sosua was without a lookout, that she did reverse her engines and swing around across the channel without any signal of her whistle, and cast her anchor practically in mid-stream of the channel.

The respondent's counsel points to the fact that the Sosua's quarter and also her rudder were struck, to show that she must have been lying crossways of the stream, as, if she had been lying with her bow downstream the barge would have glanced off the quarter, and could not have run in close enough to strike the rudder. As the steamer was loaded so as to bring the overhang of the stern near to the water, and the barge was light, it is entirely improbable that the latter could have struck the rudder of the steamer, if she had been lying with her bow downstream, as claimed by the libelant. Whether at the time of the collision she was lying directly across the channel, or canted with her bow downstream towards the Jersey shore, the maneuvers executed in coming to anchor were careless, negligent, and in violation of the rules of seamanship.

[2] The Act of March 3, 1899, c. 425, § 15 (Compiled Statutes, § 9920), provides:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft."

This act imposes an affirmative and positive duty upon vessels coming to anchor in navigable channels to see that they do not under any

circumstances, accidents excepted, prevent or obstruct the passage of other vessels; not that they shall not anchor at all in such a channel, but that when they anchor therein, they shall so anchor and in such method, as not to close the channel or unduly or unreasonably prevent or obstruct, the passage of other vessels. The Margaret (D. C.) 203 Fed. 331; Id., 213 Fed. 975, 130 C. C. A. 381; The Hesperos (C. C. A.) 265 Fed. 921.

When a vessel intends, not only to stop in a channel in which she is moving, but to anchor and to swing around so that her length obstructs the channel, she is bound to give notice of her movement or intention, or warn others not to approach until she has completed her unusual maneuver. The maneuvers which the Sosua executed took up a large part of the channel upon a dark night. She passed the Hainesport without signal about 75 feet off the Walnut street docks, crossed her bow, and directly after passing Market street began to reverse her engines, all without warning signal and without a lookout.

She violated the statutory prohibition of the act of 1899, supra, in swinging around to come to anchor without any warning or indication of her intention. If she had had a lookout properly stationed, the close approach of the Hainesport would doubtless have been observed, and the master and pilot, whose attention was directed to bringing her into a proper position to anchor, would not have had to rely upon chance to observe the approach of the Hainesport with her tow. The very maneuver she executed was an obstruction to the channel. She was bound to refrain from maneuvers calculated to embarrass the vessel in her rear in an attempt to pass. The Governor, Fed. Cas. No. 5,645.

Finding, as I do, that the Sosua was guilty of gross negligence, the question is whether the Hainesport was also guilty of negligence. The vessels passed at Walnut street. Within the short distance of three city blocks, about one-third of a mile, the Sosua had passed the Hainesport on her port side, crossed her bow diagonally, reversed, and was swinging about when the collision occurred.

The contention on the part of counsel for the libelant is that the master of the Hainesport not only should have recognized the Sosua as a fruit steamer bound for Arch street piers, but should have divined her intention of reversing her engines, throwing her stern across the river, her bow to the Jersey shore, coming around, and anchoring. But the sailing rules provide the methods by which one vessel shall know of the intended movements of the other, and, where the rules are not observed, the vessel failing to observe them cannot place the burden of making a correct guess upon the one, and impute negligence for failure to guess correctly what the other should have made plain. While it is obvious that a loaded vessel the size of the Sosua would not literally "fly around," as stated by the master of the Hainesport, it is apparent that her reversing, swinging to starboard with a flood tide, and dropping her anchor caused the stern to swing out into the stream in the darkness in a manner unexpected by the master of the tug. Finding himself suddenly confronted by this situation, he put his wheel hard to starboard, successfully bringing the tug

past the stern of the Sosua, but, owing to the flood tide, was unable to get the forward barge entirely past.

It is conceded that, if he had pulled over a few feet more, the accident would have been prevented. If he had had any actual warning from the Sosua in time, he would have been guilty of negligence if · he had not stopped and reversed. Under the circumstances, the result of his error in that respect is entirely a matter of speculation, as it is questionable whether he could have stopped the tug with her five barges in time to prevent a collision. If he was guilty of an error of judgment, it was an error of judgment in extremis, and not negligence. For him to have given a warning whistle at the same time would have been of no avail.

My conclusion, therefore, is that there was no negligence on the part of the Hainesport which would justify a division of damages.

A decree may be entered, dismissing the libel, with costs to the respondent.