SUN OIL COMPANY, as owner of the M.V. Atlantic Sun, Libellant,

v.

The S.S. GEORGEL, her engines, boilers, etc.,

and against

Central Navigation Corporation of Monrovia, Respondent.

CENTRAL NAVIGATION CORPORATION OF MONROVIA, as owner of the S.S. Georgel, Libellant,

v.

The M.V. ATLANTIC SUN, her engines, boilers, etc.,

and against

Sun Oil Company, Claimant Respondent.

United States District Court
S. D. New York.

July 12, 1965.

Mendes & Mount, New York City, for Sun Oil Co.; Alfred Lohne and Brendan J. Connolly, New York City, of counsel.

Zock, Petrie, Sheneman & Reid, New York City, for S.S. Georgel and Central Nav. Corp. of Monrovia; John R. Sheneman and James D. Hanlon, New York City, of counsel.

LEVET, District Judge.

These suits are the result of a collision between the MV Atlantic Sun and the SS Georgel which occurred in the Delaware River in the early morning of May 3, 1960. 61 Ad 65 is a suit by the Sun Oil Company, libellant, in rem against the Georgel and in personam against its owners, Central Navigation Corporation of Monrovia for damages to its ship, the Atlantic Sun, occurring in the collision. 61 Ad 876 is a cross-libel by Central Navigation Corporation of Monrovia against Sun Oil Company in personam and against the Atlantic Sun in rem to recover for damages sustained by its ship, the Georgel, in the collision. The actions were consolidated for trial.

After hearing the testimony of the parties, examining the exhibits, the pleadings, the stipulations, the briefs and the proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law pursuant to Admiralty Rule 46½:

## FINDINGS OF FACT

1. On May 2 and 3, 1960, the Sun Oil Company, a New Jersey corporation, was the owner of the MV Atlantic Sun, an American flag tanker type vessel, 547 feet in length, 72 feet in width, powered by direct drive diesel engine of 7500 horsepower with a maximum speed of 13 knots, of about 11,400 gross tons. (11, 12, 28; Pre-Trial Order) [1]

2. On May 2 and 3, 1960, Central Navigation Corporation of Monrovia was the owner of the SS Georgel, a Liberian flag Liberty type dry cargo ship 441'6" in length, 57' in width, powered by a steam engine of 2500 horsepower and of 7,253 gross tons. (506, 507; Pre-Trial Order)

3. The Georgel in ballast, under the command of Captain Marco Psilos, was bound up the Delaware River for Kaighn's Point Anchorage, Philadelphia, Pennsylvania. (510) At this time the Georgel had a maximum draft of about 12'4". (508) The Atlantic Sun, also proceeding up the river, was fully loaded with a cargo of 154,000 barrels of blending stock gasoline with a draft of 31'10". (30) The evening of May 2 and 3, 1960, on the Delaware River, was dark but the weather was clear and the visibility was good. (31, 70, 71, 264, 534) The winds were westerly, variable and light. (534) The tide was flooding at an estimated strength of 1½ knots. (97) Captain Psilos conceded that there was no total overcast that night (501); that there was more open sky than clouds (502); and Pilot Charles F. Goodrich said there was good visibility. (534)

4. The Atlantic Sun, inbound from Guayanilla, Puerto Rico, with the cargo aforesaid, was proceeding to discharge berth at Marcus Hook, Pennsylvania, and was under the command of Captain William Kegel who in 1950 had obtained a pilot's license for that portion of the Delaware Bay and River from Overfall Lightship to Marcus Hook. (11) Between 1950 and May 1960, Captain Kegel averaged about twenty trips per year on the river except for a couple of years when he was operating in the Far East. (185)

5. At 2110 on May 2, 1960, when the Georgel was in the vicinity of the Harbor of Refuge Light inside the Delaware Capes, Captain Charles F. Goodrich, a

---

licensed Delaware Bay and River pilot, boarded the ship and assumed the conn. (506–509)

6. As the two vessels continued up the Delaware River, the Atlantic Sun was astern of the Georgel until the vessels arrived in the vicinity of Ship John Lighthouse, when the Atlantic Sun overtook the Georgel. (Ex. 42) Appropriate whistle signals were exchanged and, as conceded by Goodrich, the Atlantic Sun displayed regulation navigation lights which were clearly visible to those on the bridge of the Georgel. (529, 530)

7. At 2008 on May 2, 1960, the Georgel was abeam of Overfall Lightship, Delaware River, and anchored to await the pilot. (Respondent Ex. C) At 2110 on May 2, 1960, the Georgel, after Goodrich boarded her, proceeded up the Delaware River at full speed, averaging 12.07 knots (Respondent Ex. C; Goodrich 506; Libellant Ex. 41; Bush 399) At 0119, May 3, 1960, when off Reedy Island, the Georgel was approximately 1.1 miles astern of the Atlantic Sun. (Libellant Ex. 42; Goodrich 529, 530; Bush 392) At 0211, May 3, 1960, when the Atlantic Sun was approaching the Delaware Memorial Bridge, the Georgel was 3.1 miles astern and the stern light of the Atlantic Sun was in the range of visibility of those on the Georgel, although it was not seen. (Libellant Ex. 42; Bush 392)

8. The course of the Atlantic Sun in the period before the collision was as follows: At 0243 the Atlantic Sun steadied on Marcus Hook Range, proceeding north in the center of the starboard side of the Channel (49, 50, 51, 464), reducing to slow ahead at 0247, stopping at 0252 to drift by Buoy 6M. (49, 50) At 0258½ the Atlantic Sun turned into the anchorage. (54) At this time Captain Kegel observed the Georgel 1½ miles distant coming on to Marcus Hook Range. (51, 52) At 0259½ the engines of the Atlantic Sun were stopped and put on full astern. (54) At 0302 the starboard anchor of the Atlantic Sun was let go. (55; Ex. 33)

9. The Atlantic Sun was equipped with magnetic compasses, a gyro compass, Sperry gyro pilot and a gyro course recorder, a radio direction finder, a fathometer, a loran set and radar. (12)

10. The action of the Georgel just before the collision was as follows:

(1) Immediately after the Atlantic Sun dropped anchor and the vessel swung, the Georgel left the channel in the vicinity of Buoy 6M, showed its green and red navigational lights and headed directly for the Atlantic Sun. (Kegel, 56, 57; Bush, 353, 354)

(2) At 0306, as the Georgel headed toward the Atlantic Sun, the Atlantic Sun blew a four blast danger signal, which the Georgel did not hear (485) and at 0306½ placed its engines at full astern in an attempt to avoid a collision. (Kegel 57, 58)

(3) Goodrich conceded that the speed of the Georgel up the river was 10–10½ knots and later 11–11½ knots (509); that the speed over the ground averaged 11½ to 12 (510); and that this speed was maintained until after the collision. (528)

(4) The Georgel continued without diminishing speed on a collision course, in which the bow of the Georgel struck the bow of the Atlantic Sun as the Georgel tried to turn hard right before the impact. (58, 355, 356, 513)

(5) To the time of the collision the engines of the Georgel were at full speed; only after the collision were the Georgel's engines stopped. (Psilos 482; Goodrich 555)

(6) The Georgel had no lookout on the way up the Delaware River. (See Finding of Fact No. 16)

(7) The Georgel blew no signals just before the collision. (485, 551)

11. At 0308, the pilot and Master of the Georgel sighted the Atlantic Sun at a distance of 250 to 300 feet. A hard right rudder was ordered on the Georgel and she came around 10° or 15° to the right prior to her port bow striking the stem of the Atlantic Sun. (513; see also Exs. 20, 21, 22, 23) At 0309, after the collision, the engines of the Georgel were put full astern, the wheel hard to port and the vessel left the Atlantic Sun to port

and anchored to the north of the Marcus Hook Range and north of the Atlantic Sun at a distance of about 1,500 feet. (Ex. C)

12. The evidence clearly indicates that the Atlantic Sun was in the Marcus Hook anchorage and not in the channel at the time of the collision. The collision occurred approximately 600 feet inside the anchorage. No portion of the Atlantic Sun was then in the channel.

### 1. Testimony of Captain Kegel.

The testimony of Captain Kegel of the Atlantic Sun places that vessel in the right or starboard side of the channel before turning into the anchorage. At 0252 he stopped the engine and drifted up Marcus Hook Range. He said when he came around he was nearly exactly on the range and as he came up he got over to his right slowly. (50) He was on the center line of the channel on Marcus Hook Range and as he came up the channel he came over to the right side of the channel more. At 0258½ there was no other ship in the anchorage. (51) At 0258½ he arrived at the point where he wished to turn, approximately off the No. 1 dock, which is the northerly dock of the Sun Oil Company docks. He was to the right of the center line of the channel heading up the river. (52; Ex. 13) At that point in time he put his rudder hard right and came slow ahead on the engine and the ship started to turn smartly into the anchorage. (53) The ship turned to the starboard. (54) At 0259½ he stopped the engine and requested full astern. At 0302 she appeared to be almost stopped and he ordered "slow ahead." (54) At the same time he gave the order to let go the starboard anchor. The ship was heading into the anchorage and athwart the anchorage. Two shots of chain or 180 feet were given to the anchor. (55)

Captain Kegel had been watching the Georgel and it was about this time that he noticed that the Georgel was heading right for the Atlantic Sun. At 0306 he gave the danger signal of four short blasts on the whistle. He was able to see the Georgel visibly. (56)

Captain Kegel further testified that immediately after the collision he sounded the general alarm and ordered that bearings be taken to fix the position of the ship in anchorage. (59) Captain Kegel also testified that Buoy 2M and Buoy 6M marked the right hand side of the Marcus Hook Channel when going up the river. He said that as he swung into the anchorage he observed Buoy 6M was to the right of Buoy 2M and that this confirmed that he was in the anchorage. (120) He said he was in the starboard side of the channel when he turned right to go into the anchorage. (464) The channel is 800 feet in width.

The anchor bearings were taken within a few minutes of the collision. (59, 60, 61) The ship was still at anchor and within 100 feet of its location at the time of the collision. (62)

### 2. Testimony of John Refausse.

The anchor bearings after the collision were taken by John Refausse, the third mate (281) and observed by William Bush, second mate. (366) These bearings were based on three points: (1) The back range lights of the Marcus Hook Range (bearing No. 1); (2) The green pipeline marker on the Jersey shore (bearing No. 2); (3) The center of the uppermost Sun Oil dock (bearing No. 3). (281–83) Refausse marked down the bearings on Libellant's Exhibit 12 and plotted the result on the ship's chart (285) and on Libellant's Exhibit 11. This demonstrated that the position of the Atlantic Sun was 600 feet into the anchorage at that time. Refausse also confirmed Captain Kegel's observations with respect to the lights of Buoys 2M and 6M at the time the vessel swung out of the channel into the anchorage. (289)

### 3. Testimony of Karl F. Welty.

Karl F. Welty, first mate of the Atlantic Sun and now a Coast Guard Lieutenant, testified that at the time the engines were placed astern, the anchor was down since it grabbed immediately. The danger signal given by the Atlantic Sun was given some time afterwards. He said: "We had been anchored and swung in the anchorage there awaiting to go back

to the dock, or rather awaiting to pull the anchor up." (222)

### 4. Testimony of William B. Bush.

William B. Bush, second mate of the Atlantic Sun, testified that he heard Captain Kegel order Refausse to take the bearings. He saw Refausse do so approximately two minutes after the collision (373) and he observed Refausse plot the bearings on a chart. (366) Furthermore, he checked the position of the Atlantic Sun on radar twice. (367) It was 0.2 to 0.3 of a mile from the dock. (369) Based upon lengthy experience on the Delaware, Bush estimated the Atlantic Sun was about 1,600 feet from the dock. (371) Allowing 300 feet to the westerly channel line and 800 for the width of the channel, this would place the Atlantic Sun 500 feet into the anchorage.

### 5. Testimony of Harry Albert Hays.

Harry Albert Hays, the operator of a launch service and not an employee of either party hereto, testified that he observed the Atlantic Sun coming up the river in front of the Sun Oil Company docks, saw her swing broadside into the anchorage and drop anchor. (576) Hays also testified that after the collision he crossed by small boat to the Atlantic Sun and to the Georgel. He said the Atlantic Sun, both bow and stern, was in the anchorage at the time of the collision. (580, 583) By a second trip with an official of Sun Oil Company, he concluded that the Atlantic Sun was in the anchorage. (586)

### 6. Testimony of Anthony Suarez.

Anthony Suarez, a research engineer in hydrodynamics and navigational matters, testified for the Atlantic Sun. He took readings of the course recorder of the Atlantic Sun from 2:40 through 3:30 A.M. The positions are shown on the course recorder. He examined the deck entries appearing in the log book of the Atlantic Sun for May 3, 1960. He examined the relevant deck bell book entries of the Atlantic Sun beginning at 0225. He correlated the time of the course recorder headings with the times referred to in the deck log and in the bell book. (440) He found a differential of 15 minutes between the course recorder and the readings which came directly from the course recorder because the course recorder was 15 minutes ahead of the deck log time. He also found that there was a discrepancy between the course recorder readings as corrected by him and the two ranges of 2.9°. (441) He further took the engine room orders and executions thereof from 2:14 to 3:08. (See Exs. 40, 41, 42, 47, 48)

The heading of the Atlantic Sun, according to Suarez, at the time Captain Kegel testified that he observed the Georgel coming up the river and blew the alarm (3.06½), was 191.4°. (449) On the basis of these readings he concluded as follows in respect to the position of the Atlantic Sun at the time of the collision:

(A) That the vessel was approximately 150 to 200 yards into the anchorage and had a heading of 212.9°. (444; see Ex. 48) Assuming that the vessel was in the center of the channel coming up the Marcus Hook Range at that time, no part of the vessel would be in the channel. (449)

(B) Assuming that the Atlantic Sun as it passed up Marcus Hook Range was not in the center of the channel but in the middle of the starboardhand side of the channel, Suarez testified that the bow of the vessel would be approximately 225 yards into the anchorage off the starboard side of the channel. (450–52)

Thus, four witnesses by their diagrams placed the Atlantic Sun in the anchorage: Kegel, Exs. 14, 15, 16, 17, 50, 50A; Welty, Exs. 28, 29, 30; Refausse, Exs. 31, 32; Bush, Exs. 34, 35, 36, 37, 38.

Certain diagrams made by Captain Psilos and Pilot Goodrich place the location of the collision in the easterly or starboard half of the northbound channel: Psilos, Exs. D, E; Goodrich, Exs. E, F, G and H. However, I am forced to conclude that these diagrams are opinions only rather than facts and are not substantiated by supporting evidence. I, therefore, am not inclined to believe that they are correct. One sketch by Good-

rich places the collision almost completely within the anchorage. (Ex. 51)

13. Captain Kegel conceded that there was an easterly error of approximately 3° on the gyro compass of the Atlantic Sun (109, 174) and that he had not mentioned this in his testimony before the Coast Guard. (174)

Refausse testified that errors on the gyro compass might not be reproduced on the wings of the bridge. (312) Refausse recalculated his bearings and in effect stated that if the 3° error had still existed it would have put the Atlantic Sun on the Jersey shore. (321)

Refausse stated that it is the rule, rather than the exception, that the compass shows an error while the ship is in the river under way while continually turning but that when she settles down on one heading the error will tend to disappear. (322)

I am, therefore, forced to conclude that any error on the Atlantic Sun's gyro compass did not invalidate the substantial conclusions with respect to that vessel's position being in the anchorage.

14. The Georgel compass had a $\overline{2°}$ easterly error. (510, 511)

The Atlantic Sun contends that the failure of the Georgel to consider this 2° easterly error may well explain the collision since when steering 58° it would make good a course of 60° which in turn would place the Georgel approximately 50 yards or 150 feet inside of the anchorage. (See Goodrich 547–49)

Whether this was the explanation or not, the Georgel hit the Atlantic Sun.

15. The Atlantic Sun was displaying proper anchor lights at the time of the collision.

### The After Anchor Light

The after anchor light was on. The Atlantic Sun was equipped with an anchor light on the stern, where it was hoisted on the flagstaff. (Kegel 17) Caparo, a seaman on the Atlantic Sun, was instructed by Bush, the second mate, to check the anchor light and to let him know if it was working. Caparo went back, plug-ged the light in. (Caparo 252) Bush pulled the switch and the light came on; Caparo called Bush and told him the light was working. (253–54) This was at twenty minutes to two. (255)

### The Forward Anchor Light

When the Atlantic Sun swung into the anchorage and dropped anchor, Captain Kegel ordered the third mate, Refausse, to turn on the anchor light. (Kegel 86, 87) Refausse received this order (268), walked to the navigation light panel and switched on the anchor lights. Refausse saw that the anchor lights were on. (269) Welty said the anchor light was on. (216) Bush said the forward anchor light was on. (351) These anchor lights (after and forward) were on at 1302 hours, i. e., six minutes before the collision. (Kegel 18, 88; Refausse 269, 277–279)

The forward anchor light was a regulation light to meet approval of the United States Coast Guard. The forward anchor light was located on the forestay. (Kegel 16) Welty said the light was in accord with Coast Guard regulations. (220, 221) The light is fastened to the forestay and is hoisted to a halyard approximately 40 feet above the deck. (213, 214) Bush, then the third mate, said the light was approved by the Coast Guard (375) and an inspection certificate issued. (376)

At the time of the collision the light fell (Kegel 110) by reason of the fact that it had been knocked down due to the forestay being torn loose. Welty and other men rigged another light. (Welty 218) At the time the anchor light was knocked out, Refausse heard the buzzer on the alarm panel go off, which indicated that the light had in effect just gone out. (Refausse 272, 277)

Captain Psilos conceded that before the collision he saw some cabin lights. (484) Psilos said Goodrich told him that he did not see any lights (502) but Goodrich said he saw the loom of some lights from the after port holes. (514)

I have little confidence in the testimony of the Georgel Captain, Psilos, or the Georgel pilot, Goodrich. In view of the

affirmative testimony of the witnesses from the Atlantic Sun, I cannot give credit to Captain Psilos' statement that he saw no lights (484) or pilot Goodrich's claim that he did not see anchor lights on the Atlantic Sun. (514)

The fact is that the United States Coast Guard, after an examination of the anchor lights of the Atlantic Sun, issued a certificate. (See Ex. 54, letter from Coast Guard dated March 30, 1965) Welty, the former first mate but now a Coast Guard Lieutenant, testified that the light was regulation. (221)

16. I find that the Georgel maintained no lookout at or for some time before the collision.

The pilot of the Georgel, Goodrich, testified at the Coast Guard hearing that on the Delaware he saw no lookout on board and received no reports. (500) Goodrich testified at the trial that prior to the collision he received no report from any lookout. (516) Captain Psilos was almost equally vague. He said: "The lookout was *some place* forward *maybe*, I don't know exactly." (Emphasis added) He received no reports. (481) He further testified: "As we said before, this night was dark but clear, therefore, it was *unnecessary to carry a look-out on the bow.* The men were looking out all around and that was all." (Emphasis added) (501)

Goodrich conceded:

(1) The lookout wandered around. He didn't know exactly where he was. (552)

(2) The lookout is supposed to stay at the bow. (553)

(3) He didn't recall any lookout standing at the bow within five or ten minutes of the collision. (553)

For all intents and purposes the Georgel had no lookout.

17. I find that those in charge of the Georgel were negligent in the following respects and that each of these contributed to the collision:

(1) Those in charge of the Georgel failed to maintain a proper and efficient lookout;

(2) Those in charge of the Georgel navigated the vessel at an excessive rate of speed considering the time, place and conditions then present;

(3) Those in charge of the Georgel navigated and maneuvered the vessel carelessly and negligently;

(4) Those in charge of the Georgel navigated the vessel outside the channel into an anchorage area, permitting it to strike the Atlantic Sun, an anchored vessel;

(5) Those in charge of the Georgel failed to observe the Atlantic Sun until less than one ship's length distant;

(6) Those in charge of the Georgel failed to stop or reverse her engines seasonably or to take any steps to avoid collision when danger was apparent.

18. I find that the Atlantic Sun was *in no way negligent and did not contribute to the collision.*

## DISCUSSION

### Presumptions

We have hereinabove held (1) that the Atlantic Sun was at anchor; (2) that the Atlantic Sun was displaying proper lights.

Obviously, a vessel has a right to lie at anchor. There was no obstruction of the channel. The fact that the master of the Atlantic Sun may have contemplated leaving the anchorage at an early moment in order to moor at the wharf does not bar the Atlantic Sun from the privileges of anchorage.

### Privileges of the Anchored Vessel

Since the Georgel collided with the Atlantic Sun, a properly anchored vessel displaying proper lights, the presumption is that the collision resulted from negligence of the Georgel. Burns Bros. v. Long Island R. Co., 176 F.2d 406, 408 (2nd Cir.), rehearing denied, 2 Cir., 176 F.2d 950 (1949); The Blue Goddess, 199 F.2d 460, 462 (7th Cir. 1952); The President Madison, 91 F.2d 835, 837 (9th Cir. 1937).

The rule is that the vessel in motion must exonerate herself from

blame by showing that it was not in her power to prevent the collision by adopting any practical precautions. See Griffin on Collision, p. 349. The Europe, 175 F. 596 (D. Oregon, 1909), affirmed, 190 F. 475 (9th Cir. 1911) ; Burns Bros. v. Long Island R. Co., supra; The Blue Goddess, supra.

 A vessel at anchor which can take action to avoid collision must do so. But an anchored vessel is at first entitled to rely on moving vessels to avoid her. The Lady Franklin, 14 Fed.Cas. p. 934 (No. 7,984) (D. Mass. 1873). Her first duty is to remain at rest. The Ceylon Maru, 266 F. 396 (D. Maryland, 1920), reversed on other grounds, 281 F. 538 (4th Cir. 1922). If she has the power to avoid the accident, she should do so. However, she is under no obligation to resort to extraordinary maneuvers, nor will she be liable for taking reasonable measures to avert damage, even though they may have actually increased it. The Steamer New Philadelphia, 66 U.S. (1 Black) 62, 17 L.Ed. 84 (1861).

 Although a vessel may be liable if she anchors so suddenly in the path of a following vessel that collision cannot be avoided, The Sosua, 271 F. 772 (E.D. Pa.1921), a vessel which is just in the act of dropping anchor has practically the status of an anchored vessel. Britain S. S. Co. v. J. B. King Transp. Co., 131 F. 62 (2nd Cir. 1904).

### The Lookout

Title 33 U.S.C.A. § 221 is as follows:

"§ 221. Usual additional precautions required generally (Art. 29)

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, *or of any neglect to keep a proper lookout*, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. June 7, 1897, c. 4, § 1, 30 Stat. 102." (Emphasis added)

 A lookout is a person who is specially charged with the duty of observing the lights, sounds, echoes, or any obstruction to navigation. The Tillicum, 217 F. 976 (W.D.Wash.1914), affirmed, 230 F. 415 (9th Cir. 1916). The duty to have a lookout is imperative, The New London, 271 F. 83 (2nd Cir. 1921), and the obligation to keep a proper lookout rests on the usage of navigation as well as on general considerations of prudence. The Sea Gull, 90 U.S. (23 Wall.) 165, 23 L.Ed. 90 (1874). A lookout is especially required when running a river in a dark night. The Oregon, 158 U.S. 186, 193, 15 S.Ct. 804, 39 L.Ed. 943 (1895). Also, a lookout must report. The Madison, 250 F. 850, 852 (2nd Cir. 1918).

 Where there is nothing to interfere with vision, the fact that the other vessel is not seen is all that is necessary to impute negligence to the lookout. The Pavonia, 26 F. 106 (S.D.N.Y. 1885). The lookout should be attentive to whistles, as well as to lights. When a lookout observes another vessel he should report whether it is moving or still. Griffin on Collision, 281, 282. The burden is on the Georgel to show that this deficiency did not contribute to the collision. The Ariadne, 80 U.S. (13 Wall.) 475, 478–479, 20 L.Ed. 542 (1871) ; The Propeller Genesee Chief et al. v. Fitzhugh et al., 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851).

 "[B]y the overwhelming weight of authority it is settled that the proper place for a lookout is, under ordinary circumstances—on the bow." Hough, J. in The Manchioneal, 243 F. 801, 805 (2nd Cir. 1917). An inefficient lookout is equivalent to none. The Norwich Victory, D. C., 77 F.Supp. 264, affirmed, United States v. Dump Scows No. 116, No. 120, and No. 122, 175 F.2d 556 (3rd Cir. 1949).

The lack of a proper lookout on the Georgel was a major factor contributing to the collision.

Welty of the Atlantic Sun said that at the time of the dropping of anchor (0302) there was a lookout on the bow of his

vessel. (211) Since the Captain gave the four blast danger signal at 0306, there was little, if anything, that the Atlantic Sun could do since the Georgel either was not looking toward the Atlantic Sun or did not see it and since it paid no attention to the danger signal or did not hear it and instead continued on a collision course.

## Lights

■ Affirmative testimony that lights were displayed is given greater weight than negative testimony that they were not. The Thingvalla, 48 F. 764 (2nd Cir. 1891); The Richmond, 114 F. 208 (E.D.Va.1902); The Hampton Roads, 1926 A.M.C. 1510. Here the affirmative testimony was given by Captain Kegel, Bush, the second mate, Refausse, the third mate and Caparo, a seaman, all of the Atlantic Sun; the negative testimony was that of Captain Psilos and Pilot Goodrich of the Georgel. See also The Buenos Aires, 5 F.2d 425, 429 (2nd Cir. 1924); The Mamei, 152 F.2d 924, 929 (3rd Cir.) cert. denied, Eastern Transport Co. v. Walling, 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611 (1945).

■ The Atlantic Sun, having shown that the proper navigation lights were on, has the benefit of the presumption that they continued to burn to the time of the collision. Hess Tankship Company v. S. S.M.L. Gosney, 230 F.Supp. 1 (E.D.Va. 1963); G. W. Sheldon & Co. v. Hamburg-Amer. P–A–G, 28 F.2d 249, 252 (3rd Cir. 1928); The R.B.M. Burke, 294 F. 987 (E.D.Pa.1924).

■ "A libelant suing for damage to an anchored vessel has the burden of proving that she carried proper lights." Griffin on Collision, 259.

Navigation Rules as to Lights of Vessel at Anchor require that "A vessel of one hundred and fifty feet or upward in length, when at anchor, shall carry in the forward part of the vessel, at a height of not less than twenty and not exceeding forty feet above the hull, one such light, and at or near the stern of the vessel, and at such a height that it shall be not less than fifteen feet lower than the forward

light, another such light." 33 U.S.C.A. § 180.

■ The Georgel interprets the requirements to preclude any mast or midship house from being located so that it obstructed the view of a person standing on the vessel's stern. If this view prevailed the anchor light would have to be at a point above the highest mast of the vessel and above the midship house. The height prescribed (i. e., not less than 20 feet and not exceeding 40 feet above the hull) belies this.

None of the cases referred to by the Georgel goes so far as to prescribe hanging anchor lights above all normal equipment of a ship. Such a doctrine is patently absurd.

Moreover, none of the authorities cited by the Georgel with respect to lights are appropriate to the present case. See Marshall v. The Tug Conroy, 2 F. 785 (D. Maryland 1880) (tug which permitted side lights to be obstructed by its tow); The Johanne Auguste, 21 F. 134 (S.D.N.Y.1884) (in which the lights were obscured by the sails); Briggs v. Day, 21 F. 727 (S.D.N.Y.1884) (lights of tug obscured by her tow); The Titan, 23 F. 413 (S.D.N.Y.1885) (lights of tug obcured by float which projected some 20 feet beyond the tug and had an umbrella or shed roof); The Caro, 23 F. 734 (E.D. N.Y.1884) (in which the lights were obscured by sails); The Seacaucus, 34 F. 68 (S.D.N.Y.1888) (in which the lights of the ferryboat were obscured by vessels on the other side); The City of Erie, 250 F. 259 (N.D.Ohio 1918) (failure to answer signal); The Potomac, 1937 A.M.C. 589.

■ A finding that a light was obscured or shut off will not be made on mere conjecture. The Thingvalla, supra; Griffin on Collision, 234.

The next problem produced by the Georgel is the other "lights" appearing on the Atlantic Sun. 33 U.S.C.A. § 171 provides that "no other lights which may be mistaken for the prescribed lights shall be exhibited." The lights which came from the cabins were hardly "exhibited"

nor were they such lights as might be "mistaken" for anchor lights.

If the Atlantic Sun were compelled to follow the drab custom apparently advocated by the Georgel's proctors, no lights aboard an anchored vessel, other than "anchor lights," would be permissible.

█ I find that the anchored vessel has sustained its burden of showing the display of proper lights and the display of only proper lights on the Atlantic Sun.

## Whistle Signals

The Georgel also complains because the Atlantic Sun did not give a three blast whistle signal when the Atlantic Sun reversed her engines.

Title 33 U.S.C.A. § 213 is as follows:

"§ 213. Signal of full speed of engines astern (Art. 28)

"When vessels are in sight of one another a steam vessel under way whose engines are going at full speed astern shall indicate that fact by three short blasts on the whistle. June 7, 1897, c. 4, § 1, 30 Stat. 102."

█ However, in this case there is absolutely no proof that any such failure on the part of the Atlantic Sun either contributed to this accident or collision or could have so contributed. The Atlantic Sun was endeavoring to get out of the way of the Georgel. Where a collision is imminent each vessel must do all in her power to avert it. The Mauch Chunk, 154 F. 182 (2nd Cir.), cert. denied, 207 U.S. 586, 28 S.Ct. 255, 52 L.Ed. 352 (1907); see also 33 U.S.C.A. § 212.

█ It has been held that a master cannot be charged with causatively contributing to a collision by failing to blow the full astern signal when in the circumstances his reversing would not affect the navigation of an approaching vessel, because, if blown, it might have operated as a warning signal to that vessel, which, without his knowledge, was violating the rule respecting a lookout. Crowley Launch & Tugboat Co. v. Wilmington Transp. Co., 117 F.2d 651 (9th Cir. 1941).

As stated by Denman, Circuit Judge, in Crowley Launch, supra: "If this be a fault (failing to sound a three blast whistle), it did not contribute to the collision in view of the abundant passing room." 117 F.2d at 653.

Captain Kegel conceded that he did not blow a whistle before going astern when he first started into the anchorage (177) or on the slow astern, which was in reality a stop. (178) When Kegel was about to turn, he looked down the river and could see the Georgel which appeared to be just coming off Bellevue on to Marcus Hook with plenty of room to turn left (to Atlantic Sun). (52)

Cases cited by the Georgel are not applicable here. The H. F. Dimock, 77 F. 226 (1st Cir. 1896); The Straits of Dover, 120 F. 900 (4th Cir. 1903); Yang-Tsze Ins. Ass'n v. Furness, Withy & Co., 215 F. 859 (2nd Cir. 1914); The Hokendaqua, 251 F. 562 (2nd Cir. 1918).

█ I find no merit in the Georgel's claims as to whistle signals. A full astern signal by the Atlantic Sun could not have prevented the collision and the failure to give the signal was not a cause of the collision. When the Atlantic Sun went to full astern she was attempting to avoid a collision. A full astern whistle signal from the Atlantic Sun would certainly not have enabled the Georgel to avoid the collision.

## Radar

The Georgel complains in its post-trial memorandum that the failure of the Atlantic Sun to make use of her radar prior to her turning at 0258 was a contributing cause of the accident. The reason given is that it is claimed the observation of the Atlantic Sun as to the Georgel was incorrect.

The Atlantic Sun contends (1) that it was unnecessary to use radar because the Georgel was visible to the Atlantic Sun; and (2) that the use of radar was not one of the issues prescribed in the pre-trial order.

Rule 16 of the Federal Rules of Civil Procedure provides in part that when a pre-trial order is made, "such order when

entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."

The Calendar Rules of this court (Rules 4, 5, 6, 7) also govern the calendar practices, the entering of pre-trial orders, etc. of all actions, including admiralty suits. A pre-trial order was entered herein on November 6, 1963. This order was never modified nor was any effort made by the Georgel to modify such order.

■ No claim was made at trial with respect to radar. Hence, this court will not entertain this issue at this time. As stated by the Second Circuit:

"* * * the pre-trial order enumerated the only issues to be dealt with at the trial, and these were limited to questions raised by the allegations of negligence. If the plaintiff wished to present other issues at the trial he should have asked for an amendment of the pre-trial order, which he failed to do. * * *" Fernandez v. United Fruit Co., 200 F.2d 414, 415 (2nd Cir. 1952), cert. denied, 345 U.S. 935, 73 S.Ct. 797, 97 L.Ed. 1363 (1953).

However, even if the Atlantic Sun had used radar and the issue were before this court, it is doubtful if the court could discover any advantage to be had by the Atlantic Sun by its use of radar to ascertain what it factually observed, to wit, the oncoming of the Georgel, which could rightfully be expected to keep in the channel and not collide with an anchored vessel outside the channel.

Captain Kegel said that he was able to see the Georgel visibly without looking in any radar. He said he had the Georgel in sight visually, was observing what it was doing and that the radar could not have supplied additional information except as to the rate of advance (189) and that the radar was of very little value. (190)

On the other hand, the shoe might very well be on the other foot since the presence and use of radar on the part of the Georgel might well have avoided collision. See Afran Transport Co. v. The Bergechief, 274 F.2d 469 (2nd Cir. 1960). The Georgel apparently had no radar.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of each of the consolidated actions.

2. The Atlantic Sun was anchored outside of the channel at the time of the collision and was displaying proper anchor lights.

3. Since the Georgel collided with the Atlantic Sun, an anchored vessel displaying proper lights, there is a presumption that the collision resulted from the negligence of the Georgel.

4. Since the Georgel had no lookout, it was in violation of Article 29 of the United States Inland Rules of the Road, 33 U.S.C. § 221 and, hence, was in statutory fault requiring the Georgel to prove on this trial that its statutory fault not only did not cause or contribute to the collision but that it could not have done so.

5. The Georgel has failed to sustain her burden of proof and it is therefore solely at fault for the reasons hereinbefore stated (see Finding of Fact No. 17) for the collision of May 3, 1960 between the Georgel and the Atlantic Sun in the anchorage off the Marcus Hook Range of the Delaware River.

6. The Atlantic Sun has shown that there was no negligence on her part which in any way caused the collision. The Atlantic Sun's failure to sound the full astern signal could not have been a cause of the collision.

7. Accordingly, the libellant, Sun Oil Company, is entitled to an interlocutory decree for damages, which shall be determined by a Commissioner, and the cross-libel of the respondent cross-libellant, Central Navigation Corporation of Monrovia, is to be dismissed with costs to the Sun Oil Company. Interest is to be determined upon final decree.

Settle interlocutory decree upon notice.